## J. D. SERGEANT ET AL. v. GEORGE EMLEN.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS NO. 4 OF PHILADELPHIA COUNTY.

Argued April 3, 1891—Decided April 13, 1891.

1. In assumpsit, wherein the plaintiff trustees declared for a "balance of amounts collected and received by the defendant for the use of the plaintiffs," the defendant is not liable for moneys fraudulently and secretly misappropriated by his fellow-servant, none of which reached defendant's hands.

2. The fact that the defendant, by his neglect to note and examine the entries made by his assistant in the books of the estate, failed to discover

the misappropriations, did not render him responsible, as the duty of
such supervision did not rest upon the defendant, but upon the plaintiffs.

Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM
and MITCHELL, JJ.

No. 197 January Term 1891, Sup. Ct.; court below, No. 535
March Term 1888, C. P. No. 4.

To the number and term of the court below, J. Dickinson
Sergeant, surviving trustee under the wills of Joseph Parker
Norris and Mary Parker Emlen, deceased, and certain others,
beneficiaries of the trust-estate, brought assumpsit against
George Emlen, filing a statement of claim to recover " from
the defendant the sum of $85,856.75, with interest, being the
balance of amounts collected and received by the defendant
for the use of the plaintiffs."

On March 30, 1889, issue having been joined, the cause was
referred to *Mr. Joseph B. Townsend,* a referee mutually chosen
by the parties. On March 4, 1890, the referee filed a report,
finding in substance as follows :

The will of Joseph Parker Norris, duly admitted to probate
on January 30, 1841, created certain trusts in real estate of
which he died seised, known as the Sepviva Estate, situated in
the northeastern part of Philadelphia. Mary Parker Emlen,
a daughter of said testator and a cestui que trust under his
will, died on May 8, 1872, leaving a will by which, in execu-
tion of the power conferred upon her by the will of her father,
she also created certain trusts. By changes of title through
deaths, appointments, and conveyances, all the trusts as to five
sevenths of the estate became executed, so that there were
only two sevenths as to which active trusts remained unexe-
cuted. After the passage of the act of March 2, 1842, P. L.
33, authorizing the trustees to let certain parts of the real es-
tate on ground-rent, the trustees, with the consent and by the
agreement of all parties in interest, and as the attorneys in fact
of the parties holding interests clear of the trusts, had charge
and control of all the Sepviva estate, negotiated and effected
the sales on ground-rent of the greater part thereof, collected
ground-rents and income, and managed the whole estate for
the interest and benefit, as well of the cestuis que trust as to

whom the trusts remained operative, as also of those who had become owners absolutely of their respective shares. So finding, the report of the referee proceeded:

Being thus, by agreement of all the legal and equitable owners, the general agents and managers of the estate, and the collectors and disbursers of the moneys derived therefrom, it appears from the proofs before me that J. Norris Emlen and J. Dickinson Sergeant, while both were alive and down to the year 1872, collected the income of said estate through an agent appointed by them, viz., Benjamin Ritter. They reserved to themselves all collections and re-investments of capital, and J. Norris Emlen, one of the trustees, kept a set of books in which were entered as well all income returned by Mr. Ritter as also all principal sums belonging to the estate, the re-investments of the latter, and the accounts of the distribution of the income among the parties interested.

Mr. Ritter died in the beginning of the year 1872. He had in his employment a young man named John Ruhl who assisted him in his business. Mr. Ritter, for some time before his death, was disqualified from attending to business, and for a short time before his death and down to the employment of the defendant as Mr. Ritter's successor, this John Ruhl, in his own name, collected and made return of the income to the trustees for a period covering a few months.

The defendant, who, as has been stated, was a nephew of the said J. Norris Emlen and was a member of the bar, was appointed by the trustees to take the place of Mr. Ritter as the collector of the income of this estate. His employment began about June, 1872. At the time of defendant's said employment, Joseph M. Pile, Esq., was the general counsel for the trustees in regard to the trust property, and he and the defendant had adjoining offices in the building No. 512 Walnut street. It is a notable feature that no written delegation of authority appears ever to have been executed by the trustees, or either of them, to any party who in their behalf transacted the business of the estate, or any part of such business, as the agent or attorney of them or the survivor of them. Whatever power or authority was vested in any part in their agent or agents, was by parol only or grew up by the conduct and usage of the parties.

About the time of the defendant's employment by the trus-

tees, the question of the employment of the above-named John Ruhl, as an assistant to the defendant, was discussed and considered by the trustees and the defendant. Ruhl, as has already been said, had been assisting Mr. Ritter in his lifetime; and being active and intelligent and having already acquired from his connection with the business considerable knowledge of the estate, and, from his residence in the neighborhood, knowing the names and residences of the tenants and debtors, it was very natural that his being placed as an assistant to the defendant should be considered.

—Finding that the trustees participated in the employment of John Ruhl as a sub-agent or assistant, in the conduct of the business committed to the defendant, the referee reported further:

From the commencement of the defendant's agency and down to the year 1875, up to which date the trustees had an office at 319 Walnut street where they kept their books and made their distributions, nothing but the income of the estate appears to have passed through the hands of the defendant, or to have been included in his accounts and his returns to the trustees. But after the trustees surrendered their office at 319 Walnut street, a change appears to have been introduced in the method of handling and accounting for the principal sums of the estate. The most of these principal sums were derived by the redemption or extinguishment of ground-rents. Mr. Pile, as the counsel for the trustees, would have the examination of the papers, and after their execution they would be left with him for delivery to the grantees upon payment of the principal. This principal so received was always returned by him to the trustees, so long as they had their office at 319 Walnut street. After they surrendered that, and having no separate office of their own, the practice and usage grew up of passing this principal through the accounts of the defendant. It appears that no additional compensation was allowed to the defendant for collection of any principal, nor does it appear that he had made any stipulation with the trustees or the survivor of them to collect for them such principal moneys; and yet, in point of fact, his books and his returns show that from 1875 down to the termination of the defendant's agency in December, 1887, many sums of principal passed through the accounts

of the defendant and were reported and paid over to the trust-ees. And the trustees must be presumed to have directed or sanctioned this course, because they accepted the returns and the defendant's checks without any objection or denial of his power to collect the principal. It is easy to see how the habit or usage grew up. The three offices of Mr. Pile, George Emlen and John Ruhl were all adjoining; and, practically, all the business of the estate, except the distribution of the income among the parties interested, was carried on at 512 Walnut street; so it was most convenient to adopt the course which was adopted for collecting and disposing of the principal. . . .

—The referee then found that the controversies, in this case, had mainly grown out of the peculations of John Ruhl, who, however, by his ways and deportment had managed to win the confidence of all parties connected with the management of the estate; that it was indisputable that great negligence was attributable to the defendant in regard to the duties he assumed towards the estate, in suffering Ruhl to handle all the moneys of the estate which came into the office and to make the entries in the cash book and such other books as he kept; that, in addition, the defendant, without apprising his principals that he was doing so, drew many sums of money from the cash and appropriated the same to his own use, slips being substituted either by the defendant himself or by John Ruhl for him. As to this subject, the referee reported :

These slips, now aggregating $19,857.67, the defendant recognized as chargeable to him, and they constitute part of the balance found against him. In consequence of the defendant conceiving that the sums he drew from the estate were within the amount of his share of the proceeds to be derived therefrom, and that his interest in the proceeds of the estate would be ample for the protection of the trustees, I acquit him from any participation in the criminal acts of Mr. Ruhl which I will hereafter more particularly define, though I cannot say he was free from blame in not reporting to the trustees or the survivor of them, the extent to which he had carried on this system of taking moneys for his own account.

—The referee then determined the peculations of Ruhl, and divided them into classes, as follows :

1. Income paid into Ruhl's hands which he failed to carry

into the cash book, or to deposit in bank, but appropriated to his own use; amounting to $882.75.

2. Sums of principal which came into Ruhl's hands, and were neither paid into bank nor entered in the cash book, but were appropriated to his own use; amounting to $16,535.37.

3. Moneys which came into Ruhl's hands, and were entered by him on the cash book, and taken by him out of the cash drawer from time to time, "for some of which," in the words of the referee, "he kept slips and checks for his own information, in a portion of the fire proof appropriated to his own use, the existence of which checks and slips was not made known to the defendant, or to any of the parties in interest, until his exposure in December, 1887. These checks and slips amounted in the aggregate to $17,142.45; and I ascertain and report the same at that sum, in order that if the court shall deem my charge of the same against the defendant improper, it may have the data by which to correct my report in this respect."

—Upon the facts found by the referee, he reported his conclusions of law as follows:

Upon a review of all the evidence, and upon hearing the arguments and considering the authorities cited on both sides, I decide that the moneys taken by Ruhl and included in the first two classes, designated above, ought not to be charged against the defendant. They both consist of moneys which Ruhl neither entered on the cash book nor deposited in bank, the payment of which into his hands was not known to the defendant until Ruhl's confession and disclosure, made in December, 1887.

The law applicable to sub-agents, where employed exclusively by the agent himself, appears to be that the agent himself is liable for the acts or misconduct of such sub-agent, unless by the usage or custom of trade the employment of such sub-agent is justified, as when a broker is employed to buy or sell goods, stocks or securities. In cases of this sort, the agent would not ordinarily be responsible, if he used due diligence in the choice of selecting such sub-agent. But, where the principal takes part in the selection of such sub-agent, or participates in or sanctions his employment, a different rule appears to be recognized by the authorities, and good reason seems to subsist for not holding the agent responsible for the misconduct of a sub-

Referee's Report.

agent, in whose employment the principal participated, or in whose employment he suggested, requested, or concurred.

—Citing and considering Mechem on Agency, §§ 196, 197 ; Barnard v. Kauffman, 141 Mass. 37 ; Louisville R. Co. v. Blair, 1 Tenn. Ch. 351; s. c. 4 Baxt. 407 ; Story on Agency, § 201 ; Regents of University v. Rose, 45 Mich. 284 ; Dabney's App., 120 Pa. 344, the referee concluded :

Applying the principle established by these cases to the case in hand, I find John Ruhl to have been a sub-agent whose employment to assist the defendant in his agency was participated in, sanctioned and approved by the trustees and the survivor of them. They not only approved his employment, but, according to the facts found by Mr. Clay, the auditor of the seventh account of the trustees of this estate, his employment as an assistant of the defendant was first suggested by J. Norris Emlen, one of the trustees, and the trustees stipulated to become responsible for one third of the amount of his salary. The fact that he enjoyed the confidence of the trustee himself, was further shown by the fact that Mr. Sergeant consulted him often about making investments of moneys that he held as trustee or agent for other estates, and remitted him checks for such investments, and also became a loser to a large amount by the confidence he reposed in Ruhl, who abused it and appropriated to his own use sums paid into his hands by Mr. Sergeant for investment.* In addition to which, I cannot hold Mr. Sergeant as having exercised due care and diligence in regard to the capital funds of this estate. By keeping a simple memorandum of the moneys which must have been paid off on the rents and securities of which he signed releases, and deducting therefrom the amount of cash and securities reported to him, Mr. Sergeant could have easily discovered he was getting no proper returns for the securities he so discharged, and he ought earlier to have been led to an investigation on that account. Mr. Pile was asked to explain how it happened that if the deeds of release went through his hands so much of this capital appeared to have reached Ruhl's hands, without being charged on the books and without being paid in the bank. He did not appear to be able to explain this, except upon the theory

* See Pepper v. Cairns, 133 Pa. 114; Sergeant v. Martin, 133 Pa. 122; and Sergeant v. Aberle, 134 Pa. 613.

that after the deeds were executed they were left in the fire-proof, where Ruhl had access to them, and that he delivered them and obtained the money on them without entering the proceeds upon the cash book.

That Mr. Sergeant considered that Ruhl was under some duty to him personally for his abuse of the confidence reposed in him, appears to receive confirmation from this fact: After Ruhl's peculations had been discovered, in December, 1887, Mr. Pile, on behalf of Mr. Sergeant, procured Ruhl's confession of his taking the money of this estate and other moneys which Mr. Sergeant had personally entrusted to Ruhl's hands, and procured from Ruhl a declaration and covenant in writing, dated December 20, 1887, which were given in evidence before the referee, and were followed by Ruhl's executing a judgment bond for $30,000 to the Guarantee Trust & Safe Deposit Company, for Mr. Sergeant's protection from losses from both causes; and in addition thereto, Mr. Sergeant took at the same time or thereabouts a deed of conveyance from Ruhl and wife of certain real estate (subject to encumbrances), upon the understanding that he would sell it and appropriate the proceeds thereof to the deficit from both sources. And, while referring to this matter, as it is one of the subjects I am directed by the agreement of reference to report upon, I report that up to this date it appears that Mr. Sergeant has derived nothing from this conveyed real estate, which has furnished him anything in hand to appropriate in reduction of Ruhl's indebtedness to this estate or to himself. He has made some sales, but the proceeds of what have been sold have been applied in reduction of certain encumbrances on the unsold portions of the property so conveyed to him, and no balance is at present left in his hands from that source. But this method of dealing with Ruhl on the part of Mr. Sergeant and his counsel, strengthens the propriety of the referee's conclusion to refuse to charge the defendant with Ruhl's peculations not disclosed to the defendant and not shown by the cash book.

In regard to the third class, which were moneys abstracted by Ruhl after being entered on the cash book, for which the latter retained checks and slips produced before the referee which amount to $17,142.45, I have upon consideration concluded that they ought to be charged to the defendant and

that he ought not to be relieved therefrom, for these reasons: The defendant was especially charged with the supervision of Ruhl as his assistant, and the books kept at the office were his own, and the charges made against him in the cash book by Ruhl were Ruhl's report to him that the money had been paid, and thus were the defendant's charges against himself; especially where, by a very simple arithmetical calculation, he could have ascertained whether the money had been turned over to him by Ruhl or not; that is to say, by a simple addition of the debits in the cash book, from time to time, and deducting therefrom the credits on the cash book and the amount which he, the defendant, had himself taken, the balance after these deductions ought to appear to his credit in bank, from time to time.

It was no part of the business of Mr. Sergeant or his counsel, Mr. Pile, to resort to this calculation, unless something occurred to excite their suspicion; but at any rate, when the defendant chose, he could have ascertained whether Ruhl had deposited to his credit in bank the items thus contained and charged against him in his own cash book; and therefore, though Ruhl was a sub-agent and an assistant to the defendant, employed with the approval and consent of the trustees and the survivor of them, this will not excuse the defendant from failing to exercise due supervision over Ruhl's work, so far as it was disclosed by the entries actually made on the defendant's cash book. The entries upon the defendant's cash book, therefore, I treat as his recognition that the moneys therein charged against him came into his hands, or into the hands of Ruhl for him; and his failure or neglect to verify and ascertain the fact whether Mr. Ruhl was paying over that money and depositing the same in bank, was so easy of ascertainment by him that he must be held as having received it, and as between him and the plaintiffs be chargeable with it as if he had actually received it himself.

The third class, therefore, of Ruhl's peculations has been upon a different footing from the others, and I have reached the conclusion that the defendant ought to be charged therewith. . . . .

—The referee, thereupon, found in favor of the plaintiffs the amount claimed, to wit, $85,856.75, deducting therefrom, how-

ever, the sums of income and principal, $882.75+$16,535.37= $17,418.12, as in classes 1 and 2, ante 584–5, and directed judgment to be entered in favor of the plaintiffs for $77,563.70.

To the report of the referee, the defendant filed sixteen exceptions, inter alia the following:

12. To so much of the report as finds that "In regard to the third class, which were moneys abstracted by Ruhl after being entered on the cash book, . . . . which amount to $17,142.45, I have upon consideration concluded that they ought to be charged to the defendant, and that he ought not to be relieved therefrom, for these reasons : The defendant was especially charged with the supervision of Ruhl as his assistant, and the books kept at the office were his own, and the charges made against him in the cash book by Ruhl were Ruhl's report to him that the money had been paid, and thus were the defendant's charges against himself."

13. To so much of the report as finds that the third class of Ruhl's peculations ought to be charged to the defendant.

16. And, also, to so much of the report as directs an entry of the judgment against the defendant in favor of the plaintiff for the sum of $77,563.70.

Said exceptions having been overruled by the referee and argued before the court in banc, the court, THAYER, P. J., on November 1, 1890, filed the following opinion :

After the fullest consideration of the voluminous testimony in this case, and all of the facts found by the able and learned referee to whom the cause was referred, and after weighing all that was said by the learned counsel on both sides of the argument, we are of opinion that the conclusions reached by the referee are correct in all respects, except in what relates to the charge made against the defendant in the account stated by the referee, for moneys abstracted from the estate by John Ruhl, and noted by him on the cash book, but no part of which is pretended to have come to the defendant's possession or knowledge.

Benjamin Ritter had originally been the agent for the collection of the income of the estate. John Ruhl had been employed by him to assist him. When Mr. Ritter died, the defendant was appointed agent in his stead to collect the

income, and Ruhl was appointed assistant. His appointment
had been suggested by one of the trustees. The matter was
discussed and considered by them, and his appointment to the
position must, according to the uncontradicted evidence, be
taken to have been made not only with their consent, but by
their authority; and the learned referee so finds and reports. He
was therefore a fellow-agent with the defendant, appointed to
assist in attending to the collections of the estate. He robbed
the estate and ran away. It is not alleged by anybody that
the defendant had any knowledge of his peculations. So far
as the functions performed by Ruhl for the estate, and his par-
ticipation in the receipt of moneys belonging to it, are con-
cerned, they were facts which appear to have been perfectly
well known to the trustees and their counsel. Indeed, he had
been appointed for that very purpose.

Ruhl was not Emlen's agent, but the agent of the trustees,
although, by the arrangement made when he was appointed, a
portion of the salary which he was paid was deducted from the
defendant's salary, the residue being paid by the trustees. It
appears that, although originally the trustees themselves had
attended to the receipt of the principal sums belonging to the
estate, after a time this function, also, was delegated to the
agent and the assistant agent. Sometimes the money was
handed to Emlen, sometimes to Ruhl, sometimes to the counsel
for the trustees, who would hand it sometimes to Ruhl, some-
times to the defendant, and entries thereof would be made on the
cash book. Sometimes these entries were made by the defend-
ant, sometimes by Ruhl, and sometimes by the attorney for the
trustees; for their offices were all adjoining, and all the busi-
ness was carried on there between them at No. 512 Walnut
street.

Now, the claim of the plaintiffs against the defendant is "for
a balance of amounts collected and received by the defendant
for the use of the plaintiffs." No one charges, and there is no
proof whatever, that the defendant received a penny of the
money embezzled by Ruhl, or that he had any actual knowl-
edge of his misappropriation of the funds of the estate. Why,
then, should he be charged with the moneys fraudulently
appropriated by Ruhl? The learned referee expressly acquits
him of any participation in the misconduct of Ruhl, but, while

agreeing that, inasmuch as Ruhl was a fellow-agent with the defendant, and was appointed to that position by the trustees themselves, the defendant is not, by the well-settled rule of law upon this subject, responsible for the misconduct of his fellow-agent, he thinks, notwithstanding, that the defendant should be charged with that portion of Ruhl's embezzlements which were entered upon the cash book as receipts of the estate. He considers that the agent ought not to be held responsible for the misconduct of his fellow-agent, but is of opinion that, so far as relates to such collections as were made by Ruhl and entered upon the cash book of the estate, the defendant ought to be held responsible for them in consequence of his negligence in not being more watchful of Ruhl.

In this part of the conclusion reached by the learned referee, we are unable to concur. We think that such serious consequences should not be visited upon the defendant, by reason of the simple fact that these sums collected by Ruhl were entered upon the cash book. The defendant's function was that of a mere collecting agent. The responsibility of the general management and supervision of the estate was not upon him, but upon the trustees. It was their duty to watch Ruhl, if he needed watching, and to examine his settlements. They cannot lay the results of their own negligence at the defendant's door.

The cash book is called by the plaintiffs' counsel the defendant's cash book. It is true he made entries in it of such transactions as came under his own notice, but it is also true, and is reported as a fact found by the referee, that entries were made therein both by Ruhl and by the counsel for the trustees. It seems to us, from all the evidence, not to have been, properly speaking, the defendant's book, but the cash book of the estate, in which collections were entered by whoever made them. Had the trustees done their duty and exercised some personal supervision, or had the accounts and books been kept by an accountant employed by them, or at least periodically examined by such a person, Ruhl's defalcations would have been discovered long before. It is very hard on the defendant, who appears to have had little knowledge of accounts, to charge him with Ruhl's defalcations, simply because the sums misappropriated by Ruhl were entered by Ruhl or some one else on the cash book of the

estate, and to argue that he ought, on that account, to have had constructive notice of Ruhl's misconduct and be made responsible for it.

Waiving the technical objection that such a state of facts does not by any means sustain the claim made against the defendant by the plaintiffs in their statement filed for money had and received by him, it appears to us that, considering the fact that Ruhl was not the defendant's agent, but the agent of the trustees who appointed him, and that the defendant was not the general agent of the estate, but only a clerk employed to collect its dues,—the general management of the estate remaining in the hands of the trustees,—it would be unjust, under the circumstances developed by the evidence in this case, to add to the heavy liability already properly imposed upon the defendant, a further responsibility for the misconduct of his fellow-employee, for whose acts he ought not to be held responsible. We think, therefore, that the referee's report should be corrected in this respect, and that the sum which represents the amount embezzled by Ruhl should be deducted from the amount with which the defendant is charged by the referee, together with any interest charged thereon.

It is therefore ordered that the report be referred back to the referee, to be corrected in accordance with the principles of this opinion; and that the learned referee report for what amount judgment should be entered against the defendant after making such correction. All the exceptions filed, except those which are considered in this opinion, are dismissed.

A re-hearing upon the re-commitment having been heard, the referee on November 25, 1890, filed a second report concluding as follows:

"Mr. Pile, in his argument before the referee under this re-commitment, took the ground that, inasmuch as the intention of the court was only to sustain the twelfth exception filed to the original report, and to dismiss all the others, therefore, under the re-commitment, the referee was only justified in deducting from the sum with which he originally charged the defendant, the further sum of $17,142.45, represented by the Ruhl slips; and that in going beyond that, the referee would transcend the powers conferred upon him by such re-commitment.

Opinion of the Court.

" The referee has not been able to coincide with Mr. Pile's contention, or to construe the court's directions in the order of re-commitment as confining the deductions to that item alone; on the contrary, his duty under the re-commitment appears to be, to ascertain and report the judgment against the defendant to be entered only for the moneys shown to have come into the defendant's hands, which according to this finding" amounted, including interest charged against defendant, to $33,791.88. For said sum the referee directed judgment to be entered against the defendant and in favor of the plaintiffs.

Exceptions to this report filed by the plaintiffs having been argued before the court in banc, a decree was entered, without opinion filed, dismissing the exceptions and directing judgment to be entered as last reported by the referee. Thereupon the plaintiffs took this appeal, specifying inter alia that the court erred:

4. In refusing to charge the defendant with any of the peculations of Ruhl.

5. In not charging the defendant with all the peculations of Ruhl.

6. In holding the defendant liable only for the moneys actually shown to have come into his own hands, and in not charging him with the whole deficiency of $85,856.75 in his accounts.

7. In refusing to charge the defendant with all the moneys shown to have been received by him as entered on his cash book.

*Mr. George Junkin* for the appellants.

*Mr. S. S. Hollingsworth* and *Mr. George W. Biddle* (with them *Mr. Frank P. Prichard*), for the appellee.

That neither negligence nor estoppel had anything to do with the case, the claim made being only for money had and received, counsel cited: Mechanics' Bank v. Earp, 4 R. 384; Eastwick v. Hugg, 1 Dall. 222; Hunn v. Bolland, 1 Cr. & M. 130.

PER CURIAM:

We affirm this decree upon the opinion of the learned judge of the court below.

> Decree affirmed, and the appeal dismissed at the
> costs of the appellants.