John C. MORAN, Plaintiff in Error,

v.

LOEFFLER–GREENE SUPPLY COMPANY, a Common Law Trust, Defendant in Error.

No. 37348.

Supreme Court of Oklahoma.

June 18, 1957.

Rehearing Denied Sept. 10, 1957.

Application for Leave to File Second Petition for Rehearing Denied Oct. 8, 1957.

James C. Williamson, Oklahoma City, for plaintiff in error.

Charles E. Dierker and Tom S. Williams, Oklahoma City, for defendant in error.

**WILLIAMS, Justice.**

This action was brought by Loeffler-Greene Supply Company, a Common Law Trust, hereinafter referred to as plaintiff, against John C. Moran, hereinafter referred to as defendant, to recover damages for an alleged breach of contract. After trial to a jury, a verdict was returned for plaintiff in the amount of $971.24, upon which judgment was rendered, and defendant has perfected this appeal.

The action is an attempt by a creditor to collect the indebtedness of its debtor from the debtor's lawyer, personally. It arose substantially in the manner hereafter set forth.

During the year 1952, one Fred D. Harber and Electro-Way of Oklahoma, Inc., became indebted to plaintiff in the sum of $971.24 for merchandise sold and delivered to them. Harber and Electro-Way thereafter sold and transferred their assets and business to one Angerman and one Graham. Angerman and Graham then filed suit against Harber and Electro-Way in the District Court of Oklahoma County to rescind the contract of purchase entered into by them, and the defendants therein, Harber and Electro-Way, filed a cross-petition for the recovery of the balance of the purchase price agreed to be paid thereunder in the amount of some $8,000. The attorney of record for the defendants Harber and Electro-Way in such action was John C. Moran, the defendant in the case at bar. Plaintiff, or plaintiff's attorneys, conceived the idea of attempting to collect the indebtedness due plaintiff from Harber and Electro-Way by intervening in the action brought by Angerman and Graham against Harber and Electro-Way. Accordingly, an application for leave to intervene was filed in such action. Such application came on for hearing before the trial court, and after hearing arguments the court announced that the application should be denied, but at the request of plaintiff's counsel deferred the making of a formal ruling upon the application and such application was later withdrawn the same day. Immediately following the hearing upon the application for leave to intervene, a discussion took place between one of plaintiff's lawyers and defendant, as attorney for Harber and Electro-Way. It appears that defendant suggested to plaintiff's counsel that defendant's clients, Harber and Electro-Way, had several creditors, including plaintiff, but no assets except the

cause of action against Angerman and Graham which was being prosecuted by cross-petition; that Harber and Electro-Way would like to be able to settle all their indebtedness from the proceeds of their cause of action against Angerman and Graham and be released therefrom; that defendant felt that the prospects of recovering judgment on the cross-petition against Angerman and Graham were good, but that should plaintiff succeed in intervening in the action, the possibility of such recovery would be greatly reduced. Apparently some tentative agreement of some kind was reached and defendant was asked to furnish a letter relative thereto, which he did. The letter written by defendant was as follows:

"Tax Consultant            Phone FO 5-6848

"John C. Moran
"Attorney at Law
"310 Petroleum Bldg. (Now Republic Building)
"Oklahoma City 2, Oklahoma.
"May 14, 1953

"Mr. Charles E. Dierker
Attorney at Law,
First National Building,
Oklahoma City, Oklahoma

"In re: Loffler-Green Supply vs. Electro-Way of Oklahoma.
"Dear Mr. Dierker:
"As you know I am representing the above named corporation in an action in district court defending the actions of this corporation against the plaintiff who is Pat Angerman and Lee Graham. They have filed an action to rescind the contract of sale and I believe that this action can be won on its merits.

"This is to advise you that you will be notified if any settlement is offered with regard to this law suit and no settlement will be made unless I secure your approval regarding that settlement. This case is set for trial June 5, 1953, and I suggest that as soon as this case is over we immediately get together and decide on the proper course of action at that time, in order that your claim then will be protected.

"Yours very truly,
"/s/ John C. Moran

JCM:m            John C. Moran."

Thereafter, and on June 16, 1953, the action brought by Angerman and Graham against Harber and Electro-Way was tried and a judgment rendered therein in favor of Harber and Electro-Way in the amount of some $8,750. After securing the judgment, defendant, as attorney for Harber and Electro-Way, attempted to effect collection thereof but experienced considerable difficulties in that regard and did not succeed in collecting the judgment by means of execution. Some time around October, 1953, however, Angerman and Graham offered to pay the sum of $6,500 in exchange for satisfaction of the judgment and a general release of all claims. Defendant submitted this offer to his client, Harber, who had moved to California after the trial of the case, and Harber agreed to accept the offer. Accordingly, Harber executed and forwarded to defendant a release and satisfaction to be delivered in exchange for the sum of $6,500. Angerman and Graham, who were apparently in Kansas City at the time, purchased a cashier's check in the amount of $6,500 which they forwarded to their attorneys in Oklahoma City, who in turn delivered the same to defendant in

exchange for the release and satisfaction executed by Harber. Upon receipt of the cashier's check, defendant found that it had been made payable to Fred D. Harber and Electro-Way of Oklahoma, Incorporated. Harber was in California and defendant did not know who the officers of Electro-Way were, other than that Harber was one of such officers. Defendant therefore placed the check in the mail to Harber in California, with the request that Harber endorse or procure the proper endorsement of the check and then return the same to defendant in order that defendant could cash it and disburse the money to the creditors in accordance with Harber's previously expressed intentions and instructions. One of plaintiff's attorneys inquired of defendant with reference to whether defendant had been able to collect the judgment, and defendant advised him that he had received the cashier's check above mentioned and had forwarded the same to Harber for proper endorsement and return and expected to receive it back within a few days, after which he intended to cash it and disburse the proceeds among the creditors.

After some ten days had elapsed, however, without defendant having received the check, he called Harber in California. As a result of the call, defendant received through the mail a check from Harber for his attorney fee in the case, but nothing else. He then called Harber again in California to find out what was the matter. Harber then advised defendant that the U. S. Government had moved a tax claim pending against him and Electro-Way of Oklahoma, Inc., for withholding and Social Security Tax on his employees, to California and was pressing him for payment and that he wasn't going to send the check, or the money, back to defendant, but was going to keep it there and use it to pay off the tax claim. Defendant then advised plaintiff's attorney of the developments with reference to Harber's decision not to return the check to defendant.

Thereafter, and on June 10, 1954, plaintiff instituted this action against defendant Moran. Plaintiff's petition alleged that Harber and Electro-Way were indebted to it in the amount of $971.24; that defendant was attorney for Harber and Electro-Way; that Harber and Electro-Way had filed a cross-petition against Angerman and Graham for the recovery of some $8,000 and that such claim was their only asset within this state; that plaintiff filed an application for leave to intervene in the action between Angerman and Graham and Harber and Electro-Way, which application was orally argued to the court on May 14, 1953, but no formal ruling was made thereon; that immediately after such oral argument, defendant, the attorney of record for defendants in the case argued, had an oral discussion with one of the attorneys for plaintiff in which he stated that if plaintiff were allowed to intervene in the cause it would seriously handicap him in the trial of such cause, and that if plaintiff would withhold procuring an order for and filing said petition in intervention, he would personally pay the amount due plaintiff out of any sums recovered in said lawsuit which passed through his hands; that the attorney for plaintiff then requested a letter of confirmation addressed to plaintiff's general counsel and defendant then wrote and signed a letter, a copy of which is attached to such petition as an exhibit (and which is the letter hereinabove set out); that thereafter case No. 130098 (the cause between Angerman and Graham and Harber and Electro-Way) was tried, and resulted in judgment in favor of Harber and Electro-Way in the amount of some $8,000; that thereafter, without notice to plaintiff, defendant settled said judgment for $6,000 and immediately sent the money to Harber and Electro-Way outside the State of Oklahoma; that said settlement was made without the consent of plaintiff or its attorneys; that defendant failed to pay to plaintiff out of said moneys the amount due plaintiff, to-wit, $971.24; that plaintiff knows of no way to collect said sum from Harber and Electro-Way; that by reason of the failure of defendant to notify plaintiff of the settlement, and pay to plaintiff the money due plaintiff out of the funds of Harber and Electro-Way in

his hands, plaintiff has been damaged in the sum of $971.24.

Defendant's answer consisted of a general denial; a specific denial that he agreed to pay personally the claim of plaintiff; and allegations that defendant is a licensed attorney and was at all times during the transaction in question acting as attorney for Harber and Electro-Way; that plaintiff's application to intervene in the Angerman case had already been denied by the court when the letter attached to plaintiff's petition was written; that the indebtedness of Electro-Way and Harber to individual creditors was around $6,700 and they also owed the United States around $4,000, plus penalties and interest, for withholding taxes and social security taxes they had failed to pay; that plaintiff at all times knew Harber's whereabouts; and that defendant mailed the check to Harber for endorsement with the understanding that it would be returned to Oklahoma City for disbursement to the creditors.

When the case came on for trial, defendant moved to require plaintiff to elect and specify the nature of the remedy upon which it relied, whereupon plaintiff announced that it was relying upon breach of contract.

Plaintiff presented only two witnesses. One was used to establish the indebtedness of Harber and Electro-Way to plaintiff, and the other was the lawyer who had carried on the negotiations or conversations with defendant. The latter testified that defendant had stated that "he would protect the Loeffler-Greene Supply Company to the extent of any money that was recovered in this matter to the same degree or extent that the other creditors would be protected." Upon further interrogation this witness stated:

"Mr. Moran told me that if we would withdraw our application to intervene in that lawsuit then pending and money was recovered, that the money would go through his hands and that he would see that a proper amount of the money was paid to Loeffler-Greene."

Upon cross-examination, the following testimony was given by this witness:

"Q. Mr. Williams, have you considered, in the course of your representation or co-representation of Loeffler-Greene, that Mr. Moran made himself personally liable for the payment of this money? A. I do not understand that he did.

"Q. And you do not feel now that he did? A. Not in the sense to which you are referring—promising to pay somebody else's debt; No. He never intended; he never intended to pay out of his own funds any money on behalf of Fred D. Harber or Electroway incorporated. All that he promised to do was to give me an opportunity to protect the Loeffler-Greene Company on their obligation by notifying me and giving me an opportunity to take whatever steps were necessary.

"Q. Mr. Williams, did you draft the Petition which is filed in this case? A. Yes sir.

"Q. And in this statement made in Paragraph 3; numerical paragraph 3 of the Petition: 'He would personally pay the amount due Loeffler-Greene Supply Company'; do you recall that? A. I don't recall that language. It sounds to me like it is out of context. May I see it?

"Q. I intend now to go into that. May I have that Exhibit? A. I don't believe we have the Court files in this case here. Yes, here it is. Numerical paragraph 3?

"Q. Yes sir. I want to clear up the allegation. A. The allegation to which you referred is that he would personally pay the amount due Loeffler-Greene Supply Company out of any money; any sums recovered in said lawsuit which passed through his hands. Yes sir, that's exactly what he promised to do. With, I may add, this qualification. The amount due Loeffler-Greene Supply Company we understood might not be the entire amount of their claim. It would be their pro

rata part if other creditors were making claims.

"Q. I believe you said that what you expected was to the same extent as any other creditor. A. Yes sir. We didn't expect any preference for Loeffler-Greene, and we didn't expect Mr. Moran out of his own personal funds to pay any money whatsoever.

"Q. Now, did you expect then with that in mind that in the event or regardless of what happened, that he would see that Loeffler-Greene was paid? A. No sir, absolutely not.

"Q. Now, the allegation of the petition to which I have just referred says that out of any funds recovered in said lawsuit, that he would make; protect Loeffler-Greene; is that now your recollection of the assurance that he gave you 'out of any funds recovered'? A. That was the substance of it; yes sir.

"Q. Your testimony was taken by Deposition in July 1954, was it not? A. Yes sir.

"Q. Have you read over the questions and answers that were asked and answered at that time? A. No; last week I glanced at it. I cannot say that I read it.

"Q. Referring to page 12 of that Deposition, I will ask you if this question was asked, and if this answer was given at that time: 'State what you rely on other than what appears in the letter?' Answer: Our agreement was that Mr. Moran would protect Loeffler-Greene Supply Company to the extent of any money which came into the possession of Mr. Moran or under his control in the disposition of the lawsuit, whether it was by trial of the case, satisfaction of a judgment, or settlement. He did not make any promises they would get any money in any event, but he did promise that if any money came through his hands or that he had any control over any money, he would give Loeffler-Greene Supply Company an opportunity to participate in the funds in his possession or under

his control.' Is that substantially now what you say? A. Yes sir."

Upon appeal defendant has assigned numerous specifications of error and has argued them under three assignments of error, namely, error of the court in overruling the demurrer to plaintiff's petition, error of the court in overruling defendant's motion for a directed verdict, and error of the court in giving to the jury instructions numbered 5, 6, 8 and 9, and in refusing defendant's requested instruction number 1.

In support of his proposition that the court erred in overruling his motion for a directed verdict, defendant contends that the evidence was insufficient to prove that he made the alleged contract in his personal capacity, but on the contrary the evidence shows the defendant made said contract in his representative capacity of attorney and agent for his disclosed principals, (and he is therefore not liable). Such contention is clearly well taken.

If the conversations, discussions and writing shown to have occurred were sufficient to create anything approaching the dignity of a contract, it would have of necessity been a contract between plaintiff, Loeffler-Greene Supply Co., on the one side and Harber and Electro-Way on the other, and not one between their respective attorneys, who were merely agents representing their respective principals, or between plaintiff and defendant.

It is the well established general rule that if a contract is made with a known agent acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone, unless credit has been given expressly and exclusively to the agent, and it appears that it was clearly his intention to assume the obligation as a personal liability and that he has been informed that credit has been extended to him alone. 2 Am.Jur. 247, Agency, § 315; Osenbaugh v. Virgin & Morse Lumber Co., 173 Okl. 110, 46 P.2d 952. This general rule of agency is, generally speaking, applicable to contracts ex-

ecuted by attorneys on behalf of their clients. 5 Am.Jur. 349, Attorneys at Law, § 149; and annotations at 100 A.L.R. 534. Of course, an attorney may make himself liable when he contracts without disclosing his principal, or when he acts without authority, or exceeds his authority, just as any other alleged agent may do. There is no contention made that any of such factors are present here, however, and the evidence affirmatively shows that there are not.

■ Plaintiff's contention with regard to this proposition is somewhat difficult to ascertain. Plaintiff's brief cites Restatement of the Law of Agency as authority for the principle that an agent may, by personal contract, guarantee performance by the principal and that the existence of such a guaranty may be shown by proof of a custom to that effect. Assuming, without deciding, that such is the law in this jurisdiction, it could have no application in the case at bar. There was no evidence whatsoever of any custom among attorneys in this state to guarantee performance by their clients of contracts entered into on behalf of such clients and we know of no such custom. Furthermore, plaintiff's evidence specifically indicated that defendant here did not guarantee performance by his clients.

■ Plaintiff's principal contention seems to be, however, that defendant was a party to the alleged contract personally, rather than in his representative capacity, and Restatement of the Law of Agency is cited as authority for the proposition that it is possible for an agent to contract and bind himself personally, if that is the intention of the parties to the contract. Of course, it is possible for an agent to bind himself personally, under certain circumstances, but the presumption is that the agent intended to bind his principal only, and to incur no personal liability, and unless an intention to substitute or superadd his personal liability for or to that of his principal is clearly shown, he will not be bound in his individual capacity. 3 C.J.S., Agency, § 125 b, p. 121, and

cases therein cited. The evidence here not only does not overcome such presumption, but affirmatively indicates an intention not to substitute or superadd defendant's personal liability for that of his clients.

■ The subject matter of the alleged contract was his clients' previously incurred indebtedness to plaintiff, and not an indebtedness incurred by defendant in behalf of his clients, and plaintiff's evidence regarding the alleged contract was to the effect that such indebtedness was to be paid from specified assets of defendant's clients and not by defendant personally. Such a contract would, by its very nature, have had to be made by defendant in his representative capacity rather than as a principal.

■■ It might be pertinent to observe at this point that there is no evidence that defendant personally breached the alleged contract, in any event. It is undisputed that the only asset of his clients that ever came into defendant's possession was the cashier's check in the amount of $6,500 which was made payable to Harber and Electro-Way only, and which defendant forwarded to Harber for the sole purpose of securing a proper endorsement thereon in order that the same could be cashed and the money distributed in accordance with the alleged contract. Plaintiff's contention that defendant should have endorsed such check himself and cashed it is clearly without merit. There is no evidence that defendant was authorized to endorse his clients' names to a negotiable instrument payable only to them, and no evidence that he represented to plaintiff that he was so authorized. An attorney has no implied authority to endorse the name of his client to a negotiable instrument merely because of the relationship of attorney and client, or because of his rightful possession of a negotiable instrument which requires endorsement for negotiation. Security National Bank of Duncan v. Johnson, 195 Okl. 107, 155 P. 2d 249, 169 A.L.R. 790. The case of Bradley v. Jacobson, 180 Okl. 132, 68 P.2d

511, cited by plaintiff, merely holds that by virtue of the provisions of 5 O.S.1951 § 4, an attorney has authority to acknowledge satisfaction of a judgment in favor of his client when such judgment has been paid in full, and has nothing to do with the question of the authority of an attorney to endorse his client's name to a negotiable instrument.

It is suggested that defendant should be held liable because he failed to notify plaintiff of the receipt of the check before sending it on to Harber for endorsement. It should be borne in mind, however, that plaintiff has announced it was proceeding and relying upon the theory of breach of contract. It was therefore incumbent upon plaintiff to establish a contract with defendant, a breach of such contract by defendant, and resulting damage to plaintiff, before plaintiff was entitled to recover. Even if the letter above set out, which defendant wrote to plaintiff's lawyer constituted a contract between plaintiff and defendant, personally, which it could not have, still, where is the breach thereof and any resulting damage? The letter merely stated that plaintiff would be notified if any settlement was offered with regard to the lawsuit between Angerman and Graham and Harber and Electro-Way, and that no such settlement would be made without its approval. Such lawsuit was not settled, however, but was tried and judgment rendered. Plaintiff's apparent position that the satisfaction of the judgment after it had become final constituted a settlement of the lawsuit within the meaning of the letter is clearly untenable. The letter not only plainly refers to settlement of the lawsuit, but affirmatively points out the date upon which the lawsuit was to be tried and that further action must be taken after the trial if plaintiff's claim is to be thereafter protected. Furthermore, the undisputed evidence is that plaintiff, or at least plaintiff's credit manager, was notified that the judgment was being satisfied and a check forwarded to defendant. This notification came from one of the lawyers for Angerman and Graham, rather than from defendant, but the source of the knowledge is immaterial since plaintiff could not have been damaged by defendant's failure to furnish it with information which it already had.

We are of the opinion and hold that the evidence as a whole does not warrant a recovery against defendant. Under such circumstances the motion for a directed verdict should have been sustained, Mid-Continent Petroleum Corp. v. Wilheit, Okl., 270 P.2d 645.

The judgment is therefore reversed and the cause remanded with instructions to enter judgment for defendant.

WELCH, C. J., CORN, V. C. J., and DAVISON, JOHNSON and CARLILE, JJ., concur.

HALLEY, BLACKBIRD and JACKSON, JJ., dissent.