Petroleum Marketing Corporation, Appellant, *v.*
Metropolitan Petroleum Corporation.

Argued April 29, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*Sidney L. Wickenhaver,* with him *Montgomery, Mc-Cracken, Walker & Rhoads,* for appellants.

*Arthur E. Newbold, III,* with him *Barnes, Dechert, Price, Myers & Rhoads,* for appellee.

*Thomas A. Masterson,* for appellees.

OPINION BY MR. JUSTICE BOK, May 28, 1959:

This case, proceeding in equity, concerns the collection of accounts receivable as part of the sale of a fuel oil business. The court below, confirming en banc the chancellor, found for the defendants and plaintiffs have appealed.

The sale of plaintiffs' business was made to defendant Metropolitan Petroleum Corporation for $1,250,-000. Metropolitan, in accordance with the agreement of sale, assigned its rights to Gillin and Petroleum Heat and Power Company.

By the agreement of sale plaintiffs were "to sell, transfer, convey, and deliver to the buyer, free and clear of all liens and encumbrances . . . (h) all franchises, licenses, trademarks, trade names, *customers and other records and ledgers. . ."* (Italics ours)

The accounts receivable themselves were not sold, but were covered by Paragraph 7 of the agreement, which reads as follows: "7. Collection of Accounts Receivable, The Buyer will use its best efforts until February 1, 1955, diligently to collect, as agent and for the account of PHP, all accounts receivable on the books of PHP on the closing date in respect of sales of fuel oil and oil burners, all such collections to be deposited by the Buyer in an account to be designated by PHP. Any payment received from a customer shall be treated as having been made in respect of the oldest unpaid bills of such customer. The Buyer shall not be deemed to have guaranteed the collection of any such accounts nor shall it be responsible for the collection of any such accounts. The Sellers agree not to attempt to enforce collection of any such accounts receivable prior to February 1, 1955, and not to place any accounts uncollected as of such date in the hands of an

attorney or collection agent for collection without first giving the Buyer an opportunity to purchase any such uncollected account."

At the settlement, held on August 19, 1954, defendant Gillin demanded and received from plaintiffs all copies of the retail customers' lists that they had. Plaintiffs kept no copy for themselves. As of that date the receivables totaled $271,498.19, and were pledged for a loan of $174,539.00 made to plaintiffs by the Fidelity-Philadelphia Trust Company. There were about eight thousand individual accounts.

It was agreed that the collected accounts were to be paid into an account at the bank against the loan, and by December 8, 1954, Gillin had collected enough to pay it off to the penny. In January he collected over $20,000 more and remitted it to the plaintiffs. The total collected by defendants was $203,670.89, or over seventy-five per cent of the receivables: this includes $7060.37, representing accounts that defendants bought, as they had the right to do under the agreement. Of the remaining uncollected receivables $2418.42 disappeared when one account was discharged in bankruptcy and plaintiffs managed to collect $20,344.61 themselves. The balance, $45,064.27, was the ultimate amount in suit, together with a request for an accounting.

It was agreed that the transaction is governed by the law of New York, where the contract was made.

Both parties and the chancellor have adopted the meaning of "diligence" as given in *In Re McCafferty's Will,* 147 N.Y. Misc. 179, 203; 264 N.Y.S. 38, 65 (1933), namely, that defendants had the duty at least to use such effort as it would have been prudent to use in their own behalf if they had owned the receivables, or such effort as it would have been prudent for the plaintiffs to use if they had retained possession of them.

The court below made basic findings that defendants used good faith and due diligence in fact and law to collect the 75% of the accounts that was realized, and these findings are amply supported by the evidence. We are therefore confronted with the familiar rule that the findings of the chancellor based on credibility of witnesses, supported by competent evidence, and approved by the court en banc will not be disturbed on appeal: *Kees v. Green,* 365 Pa. 368, 75 A. 2d 602 (1950).

Appellants argue that the acts of the defendants were tantamount to a conversion, but a glance at the agreement, quoted above, shows that the "customers and other records and ledgers" were sold to defendants outright and hence became their property and were no longer capable of conversion by them. In *Bradley v. Roe,* 282 N.Y. 525, 27 N.E. 2d 35, 129 ALR 633 (1940) the court said: "Where a person is rightfully in possession of property, continued custody of the property and refusal to deliver on demand of the owner until the owner proves his right, constitutes no conversion."

As for the debts apart from the paper record of them, these were choses in action and not subject to conversion. In *Vogedes v. Beakes,* 56 N.Y.S. 662, 38 App. Div. 380 (1899), the Court said: "A promissory note, a railroad bond, a certificate of stock, are doubtless the subjects of conversion, because by their seizure and their transfer to bona fide holders for value the owner may lose the thing in action which they represent. But neither the seizure of the plaintiff's books of account nor any notice served upon her debtors by the sheriff could in any manner affect her title to the claims. . . She has never lost a claim against her debtors."

Plaintiffs complain of the defendants' delay in turning back records of the uncollected accounts. Under Paragraph 7 of the agreement plaintiffs bound themselves to keep hands off the collections before February 1, 1955, and there is nothing in the agreement requiring defendants to return anything on that date. It was pushed ahead to March 1st, as the Court found. Plaintiffs assert that there was no evidence that the extension was agreed to, but Exhibit P-4 is a telegram from plaintiffs to Gillin and reads: "Settlement of accounts receivable due Feb. 1, 1955, extended to Feb. 15 and further extended to March 1 is now due." If "extended" in the mouth of the objector does not mean agreed to by him, then language has lost its savor.

This action was begun on March 21, 1955, and the chancellor has found that defendants did turn over all inactive accounts in January; that they allowed plaintiffs' accountants to take information from the original records; that after March 1st delay in delivery was caused by honest differences between the parties to protect their respective interests in the records; that on April 22nd defendants furnished a list of names, addresses, and amounts of the uncollected accounts; that defendants offered photostats of the account at plaintiffs' expense, which were rejected; that plaintiffs failed to collect the accounts in suit because they made tardy or no effort to do so; and that the defendants fulfilled their obligation with regard to the uncollected 25% of the accounts. These findings are reasonable under the evidence and justifiable under the law because the plaintiffs sold and delivered the records of the accounts to the defendants, who then were obliged to do no more about what was their own property than to provide reasonable information with which plaintiffs might try to collect the remaining accounts if they cared to. Plaintiffs, in argument, confuse their

outright sale of the "customers and records" to defendants with their retention of the account claims, of which the records were only evidence. While defendants acted as agent, Paragraph 7 of the agreement expressly relieved them of guaranteeing the accounts or of being responsible for the collection of any of them. All they undertook was to use their "best efforts diligently to collect", and the court below has found that they did. There is nothing dim or equivocal about the written agreement.

Plaintiffs assert that defendants had the duty to account for sales made c.o.d., of which there were apparently a substantial number. The agreement provides, in Paragraph 7, that "any payment received from a customer shall be treated as having been made in respect of the oldest unpaid bills of such customer." Since the whole apparatus of accounts receivable has to do with credit, the quoted provision must refer to accounts where credit was continued and not to those whose credit was so weak that cash on delivery was required to protect the account. Any other interpretation would have increased defendants' accounts receivable and decreased plaintiffs' and would have resulted, in effect, in a guarantee of the latters' accounts, against the provision of the agreement in that particular.

Plaintiffs argue that defendant Metropolitan remains liable, presumably as surety, under Paragraph 10(c) of the agreement, which reads as follows: "The Buyer may, at its election and by notice to the [plaintiff] not less than two days prior to the closing, designate one or more persons, firms, or corporations to take title to and purchase and pay for all or a portion of the Acquired Assets, without, however, releasing the Buyer of its obligations to acquire and pay for the same hereunder in the event of any default by such person, firm, or corporation."

Metropolitan, defendant signatory of the agreement, did assign its rights to Gillin and Petroleum Heat and Power Company, and the fact is pleaded in Paragraph 10 of the complaint. Plaintiff argues that the agreement compels Metropolitan to assume the accounts receivable and to pay for those that were not collected. Passing the court's finding that the assignee defendants were in no way at fault, and hence that their surety could not be liable, the argument must fail because what Metropolitan guaranteed was the Acquired Assets and these are spelled out in Article 1 of the agreement: (h), quoted at the outset of this opinion, refers to the "customers and other records and ledgers". That is all that passed under the assignment. As shown above, this referred to the evidence of the accounts, which defendants bought, but not to the claims which constituted the accounts and which plaintiffs retained as their own.

There is no doubt that the purchase price set out in Paragraph 2 of the agreement was paid, and when it was, Metropolitan's secondary liability ended, since the price of the business included the price of the records of the accounts.

Even if Gillin and Petroleum had been at fault but there had not been, as there was not, any negligence on Metropolitan's part in selecting them, Metropolitan would not have been liable for the uncollected accounts: *National Steamship Co. v. Sheahan*, 122 N.Y. 461, 25 N.E. 858 (1890); *White v. Bronson*, 120 N.Y. Misc. 73, 197 N. Y. Supp. 583 (1922); *Sergeant v. Emlen*, 141 Pa. 580, 21 A. 663 (1891); Restatement, Agency 2d, §§405, 406.

Finally, there is a small counterclaim for $1174.48, representing the taxes paid by defendants on certain motor vehicles included in the assets purchased with the business. The agreement, in 10(a), required de-

fendants to pay these taxes. The court below held, we think properly, that this tax was not a consumer's sales tax and hence not payable under the Act of July 13, 1953, P. L. 389; 72 PS §§3407-101 et seq. (pocket), because the Act taxes sales in Pennsylvania and this contract is governed by the law of New York. Moreover, the Act presumes all sales of tangible personal property to be sales at retail, which these sales, part of the purchase of a business, were certainly not. The taxes were properly held to. fall under the Use and Storage Tax Act of July 13, 1953, P. L. 377; 72 PS §§3406-101 et seq. (pocket), since they are laid upon tangible personal property purchased for use, storage and consumption in Pennsylvania. The fact that defendants erroneously called it a Consumer's Sales Tax in their pleading of new matter is of no importance against the actual nature of the tax and the nature of the transaction upon which it was laid.

Defendants withheld $1142.37 against the tax claim, and hence there is due them under their counterclaim $32.11.

The decree is affirmed, costs to be paid by appellants.