Ralph W. SHEBESTER, d/b/a Shebester Stallion Station, Plaintiff–Appellant,

v.

TRIPLE CROWN INSURERS, a Florida insurance corporation, Defendant–Appellee,

and

Quality Insurance Company, d/b/a Quality Property and Casualty Insurance Company, Defendant.

No. 74087.

Supreme Court of Oklahoma.

Feb. 11, 1992.

---

6. *B & P Construction Co. v. Wells,* 759 P.2d 208, 209 (Okl.1988).

Alan Agee and Brett Agee, Garvin, Agee, & Meisel, Pauls Valley, for plaintiff-appellant.

Murray E. Abowitz and Rita J. Dingus, Murray, Abowitz and Welch, Oklahoma City, for defendant-appellee.

OPALA, Chief Justice.

The United States Court of Appeals for the Tenth Circuit certified the following question pursuant to the Uniform Certification of Questions of Law Act, 20 O.S.1981 §§ 1601 et seq.:

"Does a seller of property state a cause of action in tort against an agent of an insurance company where the seller alleges that:

1. The seller sold the property to a purchaser on credit terms under an agreement that required the purchaser to have in force an insurance policy on the property with the seller named as a beneficiary, to the extent of the unpaid balance of the purchase price;

2. The purchaser purchased insurance coverage, but failed to purchase the required coverage for the seller, thus the

insurance policy did not include the seller as a beneficiary;

3. The property was destroyed and the insurance proceeds were paid to the purchaser;

4. Prior to payment of the proceeds to the beneficiary (the purchaser), the agent for the insurance company was informed by the seller that the sales agreement required that the seller be named as a beneficiary of the insurance policy and that the purchaser's debt to the seller had not been satisfied?"

*The circuit court invites our attention to some authorities in other states and requests that we search for an appropriate Oklahoma-law norm* [1]—*ex contractu, ex delicto, or otherwise—which governs the duty of an insurer's agent toward persons who claim insurance proceeds based on a contract with the insured, collateral to the policy, of which the agent acquires knowledge before the proceeds' payout is effected.* [2]

We answer the certified question in the negative and hold that under the facts of this case no actionable tortious invasion may be pressed either under Article 9 of Oklahoma's Uniform Commercial Code

---

**1.** This action comes within the federal court's diversity jurisdiction, 28 U.S.C. § 1332. The certified question seeks an answer based upon the law of Oklahoma where all events occurred. We thus take as a given that the transaction in suit is governed by Oklahoma law.

**2.** The circuit court explains the problem in the following paragraph:

"There is authority in other states for the proposition that an insurance *company,* with knowledge of a sales contract or mortgage clause that obligates the purchaser/mortgagor to procure insurance for the benefit of the seller/mortgagee, cannot pay the loss proceeds to the purchaser/mortgagor without incurring liability to the seller/mortgagee. *See* 5 Couch on Insurance, §§ 29:68 and 29:89 (2d ed. 1984); 4 Appleman Insurance Law and Practice, § 2268 (1969). *See also Cromer v. Cromer,* [293 S.C. 360], 360 S.E.2d 528, 530 (S.C.Ct.App.1987) ('[A]n insurer who makes payment to another after notice and in derogation of such equitable lien does so at its peril.'); *Wade v. Seeburg,* 688 S.W.2d 638, 639 (Tex.Ct.App.1985) ('Even though not listed as an insured in a fire insurance policy, a vendor-mortgagee may recover the proceeds of

such a policy where the vendee-mortgagor has agreed to insure the property for the benefit of the vendor-mortgagee. The right to the proceeds may be enforced directly against the insurer.'); *Employer's [Employers] Mut. Casualty Co. v. Standard Drug Co.,* 234 So.2d 330, 333 (Miss.1970) (citing Couch); *Northwestern Fire & Marine Ins. Co. v. New York Life Ins. Co.* [238 Ky. 229], 37 S.W.2d 67, 69 (Ky.Ct. App.1931) (insurer liable to mortgagee for proceeds paid to mortgagor in light of mortgagee's equitable lien and insurer's knowledge of the lien after the policy was written but before payout). *We are unaware of any authority that has extended such liability to an agent of an insurance company except for the case of Westchester Fire Insurance Co. v. English,* 543 S.W.2d 407, 414 (Tex.Ct. [Civ.] App. 1976). There, the Texas Court of Appeals held that an insurance agent may be liable to a mortgagee under a negligence theory when, after notice of the mortgagee's interest in the property, the agent fails to include the mortgagee as a beneficiary on the mortgagor's insurance policy. *It appears to this court that there is no controlling precedent of the certified question in the decisions of the Supreme Court of Oklahoma...."* [Emphasis supplied].

[U.C.C.][3] or under this state's common law. We also answer another question which we view as fairly comprised within that which is posed, though perhaps not explicitly propounded to us. The seller may be entitled to recover against the agent, if the latter acted for an undisclosed principal insurer, (1) as third-party beneficiary of the buyer's insurance contract or (2) for wrongful payout in breach of the insurer's quasi-contractual duty to deliver proceeds to one whose claim should prevail. We defer to the circuit court's panel for a decision as to whether, on the record in this case, the applicable standards of federal appellate review allow the seller to invoke either of the two *ex contractu* theories of recovery.[4]

## I.

## ANATOMY OF FEDERAL LITIGATION

An installment contract for the purchase of a horse, which led to this litigation, provides that the buyer will purchase insurance for the seller's benefit to the extent of the outstanding debt. The buyer insured the horse, but it named itself as the policy's beneficiary. After the horse died but before payout of the proceeds to the buyer, the seller made demand on the insurer's agent for his share of the proceeds. The seller furnished the agent with copies of (1) his installment-purchase agreement with the buyer and (2) a letter from the buyer's managing partner, which directed the company to pay the seller the amount outstanding on the contract.[5] *Several months later the insurer's agent paid all of the proceeds directly to the buyer.*

The seller sued the buyer, the insurer's agent, and the insurer[6] in the United States District Court for the Western District of Oklahoma. The district court gave the seller a judgment against the buyer for $25,000.00[7] and summary judgment went in favor of the agent.[8]

The seller, who appealed, claims that the agreement to insure the horse for his benefit entitles him to recovery against the *in-*

3. 12A O.S.1981 §§ 9–101 through 9–507.

4. This court needs no explicit grant of jurisdiction to answer certified questions from the federal court; such power comes from the United States Constitution's grant of state sovereignty. By answering a state-law question certified by a federal court, we may affect the outcome of federal litigation, *but it is the federal court who hears and decides the cause. Scott v. Bank One Trust Co., N.A.,* 62 Ohio St.3d 39, 577 N.E.2d 1077, 1079–80 (1991). "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the state." *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188, 1194 (1938). Certification assures that federal courts are apprised of the substantive norms of the Oklahoma legal system. *Because governing federal procedural norms are to be applied by the federal court, we simply identify the available ex contractu remedies under Oklahoma law and leave for the circuit court panel to decide whether, under the record before it, the seller may invoke these theories in the present appeal.*

5. In dispute between the parties is whether buyer, a partnership, actually instructed the insurance agent to pay seller. It appears that conflicting instructions may have come from the partnership's managing agent and from the entity's attorney.

6. The insurer, Quality Insurance Company, d/b/a Quality Property and Casualty Insurance Company, is not a party to this appeal. Because it is in receivership, proceedings against it were stayed below.

7. The judgment has not been paid and the seller contends the "possibility of collecting that judgment is dubious at best."

8. The district court assumed—for purposes of deciding agent's summary judgment motion—that the agreement gave seller an equitable lien or mortgage. Such a contractually created nonstatutory lien is based on the principle that equity regards as done what ought to be done. 4 J. Pomeroy, *A Treatise on Equity Jurisprudence* § 1233, 692 (5th ed. S. Symons 1941).

We do not address the question whether equitable mortgages in chattels survive Oklahoma's adoption of the U.C.C. This issue is not fairly comprised within the certified question. For a thorough discussion of both the view that Article 9 abolished equitable liens and an argument for their continued viability, *see* Hillman, McDonnell and Nickles, *Common Law and Equity Under The Uniform Commercial Code* § 19.-03. Professor Grant Gilmore of the University of Chicago Law School, one of the commentators for Article 9, suggests in a treatise written after the Code's adoption that "if the Code in some sense *abolishes* the equitable lien, it will have to be *invented* all over again." Professor Gilmore believes that *beyond* the area of *institutionalized types of financing transactions* "there stretches a no man's land, in which strange creatures do strange things."* [Emphasis supplied]. 1 *Security Interests in Personal Property* § 11.1, 336–337 (1965).

Oklahoma does not regard Article 9 as a *sweeping repeal of all* preexisting common-law rights. *Adams v. City Nat. B. & T. Co. of Nor-*

*surer's agent.* Although he frankly admits he cannot identify precisely the applicable theory of liability, he asserts that when faced with similar facts, some jurisdictions have recognized an insurer's duty to prevent wrongful payout of proceeds.[9]

## II.

### THE SELLER'S TORT THEORIES

#### A.

#### APPLICATION OF THE UNIFORM COMMERCIAL CODE

■ The seller claims he has a security interest in the collateral and that the insurer's agent converted the policy proceeds within the meaning of 12A O.S.Supp.1984 § 9–306(2).[10] The insurer's agent responds that the installment-purchase agreement did not even create a security interest. Article 9 of the U.C.C. governs in this state all security interests in personal property.[11] A written security agreement describing the collateral and signed by the debtor is the *sine qua non* of a nonpossessory security interest in goods.[12] In short, although the agreement before us is in writing and signed by the buyer, it lacks language showing an intent to secure the collateral.[13]

*man, Okl.,* 565 P.2d 26, 30–31 (1977); *Central Nat. B. & T. Co. of Enid v. Community B. & T. Co.,.* Okl., 528 P.2d 710, 713 (1974). *See Utica Nat. Bank & Trust v. Assoc. Prod.,* Okl., 622 P.2d 1061, 1065 (1981), where we held the rights between a seller and his broker, *inter se,* are to be governed not by the Kansas version of Article 9 but rather by the principles of common-law agency.

9. *See,* generally, 5 Couch on Insurance 2d *infra* note 17.

10. The pertinent terms of 12A O.S.Supp.1984 § 9–306 are:

"... (1) 'Proceeds' includes ... [i]nsurance payable from any source by reason of loss or damage to the collateral ... even though such insurance payments may be made by third party tortfeasors or their insurers, except to the extent that it is payable to a person other than a party to the security agreement....
(2) Except where this article otherwise provides, a security interest continues in collateral, notwithstanding sale, exchange or other disposition thereof, unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."  .
Seller cites the following cases in support of his U.C.C. conversion theory: *First Nat. Bank of Bethany v. American General,* 927 F.2d 1126 (10th Cir.1991); *Brown v. First National Bank of Dewey,* 617 F.2d 581 (10th Cir.1980); *Terra Western Corp. v. Berry & Co.,* 207 Neb. 28, 295 N.W.2d 693 (1980). For the reasons to be discussed *infra* in this section of this opinion, these authorities are not applicable to this case.

11. A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." 12A O.S.Supp.1988 § 1–201(37)(a).

Article 9 replaced Oklahoma statutes on chattel mortgages (former 46 O.S.1961 §§ 51–94),

pledges (former 55 O.S.1961 §§ 1–25), and one statute on conditional sales contracts (60 O.S. 1961 § 318). Oklahoma Code Comment § 9–101. It also superseded existing legislation dealing with security devices such as trust receipts, factor's liens, and assignments of accounts receivable. Official U.C.C. Comment § 9–101.

12. *Sine qua non* means "indispensable requisite or condition". *Black's Law Dictionary,* p. 1242 (5th ed. 1979).  .

A security agreement is an "agreement which creates or provides for a security interest." 12A O.S.Supp.1984 § 9–105(1).
The formal requisites of a security interest are set out at 12A O.S.Supp.1984 § 9–203; its pertinent terms are:
"(1) ... a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
    (a) the collateral is in the possession of the secured party pursuant to agreement; or the debtor has signed a security agreement which contains a description of the collateral, ...
    (b) value has been given; and
    (c) the debtor has rights in the collateral.
(2) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) of this section have taken place unless explicit agreement postpones.the time of attaching. * * *"
To determine whether a description of collateral is sufficient, *see* 12A O.S.1981 § 9–110 which provides that "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

13. The complete terms of the agreement between the seller and the buyer provide:

"This agreement is hereby entered into this 8th day of March 1984, by and between Shebes-

*This fundamental flaw precludes the seller from invoking § 9–306(2) to sue for conversion of the proceeds.*

## B.

## THE AGENT'S EX DELICTO LIABILITY AT COMMON LAW

The seller, who admits that under extant Oklahoma jurisprudence these facts do not give rise to a common-law tort, theorizes his action *should be maintainable* as one for conversion, quasi-conversion, or a "yet unnamed" tort.

■ Conversion is an illegal taking of another's personalty inconsistent with his ownership rights.[14] The general rule in Oklahoma is that only *tangible personal property* may be converted.[15] An action

for conversion would not lie. What the seller has here is the right to recover money, a *chòse in action*, which under Oklahoma law is considered *intangible personal property*.[16] The agent's wrongful payment to another neither extinguishes the seller's claim nor affects the superior claimant's title to the proceeds. We accordingly hold that the seller's claim for wrongful payout is not maintainable as common-law conversion.

■ The seller relies extensively on several sections of *Couch on Insurance 2d* to support his "yet unnamed" tort theory.[17] We have considered this instructive text and the authority cited in its support but remain unpersuaded that a new tort should be fashioned to hold an insurer's agent liable *ex delicto* for failure to pay proceeds to the proper claimant.[18]

---

ter Stallion Station, hereinafter referred to as seller, and the Calm Tom Partnership, consisting of John A. Flint, J. Kelly Flint, George Marchbanks, and Pat Swan, hereinafter referred to as buyers.

It is agreed that seller desires to sell and buyers are willing to purchase the Quarter Horse Stallion, Calm Tom, who's [sic] sire is Showum Jet and his dam is Calm Kathy, [sic] The total agreed price is to be $75,000.00, with the following terms:

To be paid at time of
signing . . . . . . . . . . . . . . $25,000.00
To be paid on or before
Sept. 1, 1985 . . . . . . . . $25,000.00
To be paid on or before
Sept. 1, 1986 . . . . . . . . $25,000.00

With no interest assessed to the unpaid balance. [sic]

The seller guarantees Calm Tom, [sic] to be fertile for breeding purposes. The buyers agree to purchase and have in force, an insurance policy with adequate coverage, with Ralph Shebester named as beneficiary to the extent of his outstanding debt, before the horse is moved from Shebester Stallion Station."

The agreement was signed by the seller and by John A. Flint, partnership manager, on behalf of the partnership.

14.  *Benton v. Ortenberger,* Okl., 371 P.2d 715, 716 (1962).

15.  *Whayne v. Seamans,* 95 Okl. 168, 217 P. 859, 864 (1923).

16.  *Perkins v. Oklahoma Tax Commission,* Okl., 428 P.2d 328 (1967) (syllabus 1). The terms of 60 O.S.1981 § 312 provide:

"A thing in action is a right to recover money or other personal property, by judicial proceedings."

*See Moore v. Stanton,* 77 Okl. 41, 186 P. 466 (1919); *see also Petroleum Marketing Corp. v. Metropolitan Petrol. Corp.,* 396 Pa. 48, 151 A.2d 616 (1959); *Siegal v. Trav-Ler Karenola Radio & Television Corp.,* 333 Ill.App. 158, 76 N.E.2d 802 (1948) (syllabus 2). *Brod v. Cincinnati Time Recorder Co.,* 82 Ohio App. 26, 77 N.E.2d 293, 295 (1947); *Contra Durst v. Durst,* 225 Md. 175, 169 A.2d 755 (1961).

17.  5 *Couch on Insurance 2d* §§ 29:68, 83, 89, 104 (1984).

18.  Because appellant did not advance the notion of the insurer's *ex delicto* breach of duty of good faith and fair dealing, which we recognized in *Christian v. American Home Assur. Co.,* Okl., 577 P.2d 899 (1978), and that theory was neither explicitly nor implicitly certified to us for answer, we express no opinion concerning the applicability of this theory to the claim at hand. We note that the insurer's duty to deal fairly and act in good faith does not extend to every party entitled to payment from insurance proceeds; there must be either a statutory or contractual relationship between the insurer and the party asserting the bad-faith claim. *Allstate Ins. Co. v. Amick,* Okl., 680 P.2d 362, 364 (1984). The beneficiary of a life insurance policy may assert such a claim. *Roach v. Atlas Life Ins. Co.,* Okl., 769 P.2d 158 (1989).

## III.

### THE SELLER'S CONTRACTUAL REMEDIES AGAINST THE INSURER'S AGENT

#### A.

### THE AGENT'S STATUS VIS–A–VIS THE INSURER

■ The circuit court asks that we answer whether an insurer's agent would have individual liability for the wrongfully paid-out proceeds.[19] The seller contends that in making the payment of proceeds, the agent was acting for the *insurer* who was an *undisclosed principal.*[20] When liability for an *ex contractu* breach is sought to be imposed upon an agent, a familiar common-law principle must govern. *One who deals as an agent in behalf of a disclosed principal is not liable for the latter's ex contractu breach.*[21] The doctrine's rationale is that an agreement made with a known agent for a disclosed principal is a contract with the principal alone. The very same rule applies to insurance contracts.[22]

■ Assuming the agent acted for the insurer as an undisclosed principal, we identify today two theories, both under the contract rubric [23]—that of third-party-bene-

19. The circuit court cites *Westchester Fire Ins. Co. v. English,* supra note 2, a case in which an insurance agent was held liable for negligence. The evidentiary materials before the trial court do not disclose in this case and the seller did not allege that the agent was negligent or acted intentionally or in bad faith. *Westchester* is therefore inapplicable here. It is also distinguishable factually. *There, recovery was sought for an agent's negligence in failing to have the policy name as a beneficiary one whose identity was communicated to the agent at the time the policy was purchased and while the agent was acting for the buyer of the policy.* Equally inapplicable is *Continental Ins. Co. v. Bayless & Roberts, Inc.,* 608 P.2d 281, 287 (Alaska 1980), *where the action was predicated on negligent investigation of a claim against the insured and where the court found, under the facts of that case, that the agent owed the insured a "fiduciary duty."*

20. Seller contends he believed his claim was against Triple Crown Insurers, *qua* insurer. Only after filing this suit did he learn that Triple Crown cast itself in the role of insurance agent. It is then that he added Quality Insurance Company as party defendant. On the other hand, the agent claims its agency relationship with Quality Insurance Company was disclosed to "all those with whom it dealt, principally those in privity with Quality and those who were insured under the policy, i.e. the Calm Tom Partnership." The agent contends it had no duty to disclose the relationship to the seller because he was a "stranger to the [insurance] agreement and thus had no right to enforce it against Triple Crown."

21. In *Bane v. Anderson, Bryant & Co.,* Okl., 786 P.2d 1230, 1234 (1990), we explained the general principles that distinguish agents' contract from their tort liability. One who commits a *tortious* act while acting as agent for another within the scope of his authority is individually liable. On the other hand, an agent is contractually liable *only when acting for an undisclosed principal.* See *Moran v. Loeffler–Greene Supply Company,* Okl., 316 P.2d 132, 137 (1957); *Osenbaugh v. Virgin & Morse Lumber Co.,* 173 Okl. 110, 46 P.2d 952, 954 (1935).

Oklahoma law is in accord with that of other jurisdictions. *See* Restatement (Second) of Agency § 343 (1957) which states in pertinent part:
"An agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal...."
An agent's contractual liability is discussed in restatement's § 320 and comment b which state:
"... a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract. * * * One bringing an action upon a contract has the burden of showing that the other is a party to it."

22. *Underside v. Lathrop,* Okl., 645 P.2d 514, 516 (1982). The same rule was applied in *Glens Falls Ins. Co. v. Johnson,* Okl., 403 P.2d 229, 232 (1965). There the liability of the insurer was held primary. The dismissal of its agents did not exonerate the company of its contractual liability.

An insurance agent is a person expressly or impliedly authorized to represent an insurer in dealing with third persons. There can be different types of insurance agents, but one whom the company employs to write insurance by and in the name of the company, is sometimes called a policy-writing agent. *Glens Falls Ins. Co. v. Johnson* at 332.
The Claims Resolution Act, 36 O.S.Supp.1986 §§ 1251 et seq. (effective Nov. 1, 1986, after the claim in suit was denied) defines an agent as "any individual, corporations, association, partnership, or other legal entity authorized to represent *an insurer* with respect to a claim."

23. *T & S Investment Co. v. Coury,* Okl., 593 P.2d 503, 505 (1979).

ficiary as well as that of quasi-contractual duty to pay the rightful claimant—both of which might be available in support of the seller's claim.[24] An action is one *ex contractu* when recovery is sought for breach of (a) an express promise, (b) a promise implied in fact or (c) a promise implied in law.[25] A third-party beneficiary contract is based upon a promise implied in fact while, as we will more fully explain, a quasi-contractual duty to pay the rightful claimant arises from a promise implied in law.

## B.

### THE SELLER AS THIRD–PARTY BENEFICIARY OF THE BUYER'S INSURANCE POLICY

The seller contends that even if he has no cause of action in tort, the agent is nonetheless liable to him for the undisclosed principal insurer's breach of contract. A contract made expressly for a third person's benefit is enforceable by that person.[26] He need not be a party to nor be named in the contract to occupy a third-party beneficiary status.[27] Assuming that, on this record, the seller meets the procedural and evidentiary standards to place the agent in the position of one who was acting for an undisclosed principal and also to place itself in a third-party beneficiary status under the buyer's policy, the applicable norm of Oklahoma law would give the seller standing to enforce the policy against the agent, *qua* obligor.

## C.

### QUASI–CONTRACTUAL LIABILITY FOR WRONGFUL PAYOUT

The following principles of an insurer's liability for wrongful payout are generally accepted: (1) an insurer who chooses to pay one of two or more competing claimants does so at its own risk; and (2) payment to the named beneficiary with notice of another person's adverse claim renders an insurer liable to the legally entitled claimant for the amount wrongfully paid.[28] National jurisprudence applying these rules is indeed scarce. It yields no clear clue to the rationale for imposing this form of liability that bears the unmistakable earmarks of a quasi-contractual obligation.[29]

Oklahoma law recognizes a remedy in certain situations where, as here, privity of contract between the parties may be absent. Quasi-contracts (also called implied-in-law or constructive contracts) are a class of obligations imposed or created by law without regard to the assent of the party bound. A party's intention is disregarded. The duty is drawn from the facts, and the obligation is imposed as a matter of law or natural equity.[30]

> "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

**24.** The record sheds little light on the agent's real status vis-a-vis the insurer. As we view the issue, the resolution of that status must be deferred to the circuit court's *own assessment* of the record before it. That court must determine whether the evidentiary materials support the seller's assertions as to the agent's status and whether the record as a whole entitles the seller to invoke in this appeal either of the two *ex contractu* theories *which appear to us as not having been advanced at nisi prius. See supra* note 2, where we quoted from the text of the certified question and note 4, where we observed that these issues are to be governed by the appellate practice of the United States Court of Appeals for the Tenth Circuit.

**25.** *Uptegraft v. Home Ins. Co.,* Okl., 662 P.2d 681, 684 (1983); *Thiry v. Armstrong World Industries,* Okl., 661 P.2d 515, 519 (1983) (Opala, J., concurring).

**26.** The terms of 15 O.S.1981 § 29 provide:

**27.** *Barbero v. Equitable Gen. Ins. Co.,* Okl., 607 P.2d 670, 673 (1980).

**28.** 4 *Couch on Insurance 2d, supra* note 17 at § 27:178, 891. *See 6 Appleman's Insurance Law and Practice* § 4008, 135 (1991 Pocket Parts); *see also* 46 *C.J.S.* Insurance § 1198, 136 (1984).

**29.** *See e.g. Gray v. Holyoke Mutual Fire Insurance Company,* 293 Ala. 291, 302 So.2d 104 (1974) (citing Couch 2d).

**30.** As explained in *First Nat. Bank v. Matlock,* 99 Okl. 150, 226 P. 328, 331–32 (1924), quasi-contracts "rest solely on a legal fiction," and are not actually contractual obligations but "are clothed with the semblance of contract for the purpose of the remedy. . . ." The law will thus isolate from the parties' interaction the obligor's duty and "infer a promise even as against [the obli-

■■■■ The liability of an insurer (and hence that of the insurer's agent acting for an undisclosed principal insurer) for wrongful payout of proceeds rests on an implied-in-law obligation to pay the rightful claimant. We accordingly hold that an agent for an undisclosed insurer is itself bound by a quasi-contractual duty, not only toward the beneficiary named in the policy, but also to those outsiders of whose claimed interest in the proceeds the agent has timely notice.[31] When there are several competing claimants of whom it has timely knowledge, the agent for an insurer acts at its own peril when paying out the proceeds without interpleading all parties claimant in a proper action.

■■ Oklahoma's interpleader statute provides that a party potentially exposed to double or multiple liability for wrongful payment may tender the claimed property into court for a decision on the priority of claims.[32] Interpleader, which is viewed

gor-promisor'] intention...." Some examples of cases in which a quasi-contractual duty has been implied are *Welling v. American Roofing, etc.*, Okl., 617 P.2d 206, 209 (1980), which was an action by subcontractor to recover for his services; *Berry v. Barbour*, Okl., 279 P.2d 335, 337–338 (1955), where a contractor repaired a building's fire damage to preserve it for the absent owner and *Piggee v. Mercy Hospital*, 199 Okl. 411, 186 P.2d 817, 818–819 (1947), in which a hospital sued for the reasonable value of its services rendered to an unconscious patient.

31. The business of insurance is affected with public interest. *German Alliance Ins. Co. v. Lewis*, 233 U.S. 389, 408, 411, 34 S.Ct. 612, 617–18, 58 L.Ed. 1011 (1914). In that case the United States Supreme Court noted the words of Lord Chief Justice Hale in his seventeenth-century treatise *De Portibus Maris* (1 Harq.Law Tracts 78), quoted earlier in *Munn v. Illinois*, 94 U.S. 113, 126, 24 L.Ed. 77, 84 (1876):

"that when private property is '*affected with a public interest* it ceases to be *juris privati*' [of private right] only" and it becomes "*clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large;*" and so using it, the owner "*grants to the public an interest in that use,* and must submit to be *controlled by the public for the common good.*" [Emphasis supplied].

This is the principle that explains an insurer's *duty toward those with valid claims,* which extends *dehors* its *contractual duty to a named insured* that is articulated within the four corners of the written insurance policy.

Oklahoma's extensive regulations of the insurance business are found at 36 O.S.1981 §§ 101 et seq., the Oklahoma Insurance Code. Additionally, insurers are frequently directed by statutory law to pay proceeds to persons other than the named beneficiary. *See,* e.g., the provision for the automatic revocation of a beneficiary upon divorce at 15 O.S.Supp.1989 § 178 A; its pertinent terms are:

"If, after entering into a written contract in which provision is made for the payment of any death benefit ... the party to the contract with the power to designate the beneficiary of any death benefit dies after being divorced from the beneficiary named to receive such death benefit in the contract, all provisions in such contract in favor of the decedent's former spouse are thereby revoked...."

*See also,* e.g., the statute providing that certain persons causing death are not to benefit by decedent's insurance at 84 O.S.1981 § 231; its pertinent terms are:

"* * * no beneficiary of any policy of insurance ... payable upon the death or disability of any person who in like manner takes, or causes or procures to be taken, the life upon which such policy ... is issued ... shall take the proceeds of such policy * * *"

In such cases the statute provides the notice that is required as a prerequisite for the imposition of liability on an insurer for paying the named beneficiary who is not entitled to the proceeds.

The duty of an insurer to pay the rightful claimant is very much like that described in cases where a trustee makes payment of trust funds to a person other than the beneficiary entitled to receive the money; he is liable to the beneficiary unless the proper court authorized the payment. This liability is enforced even though the wrongful payment results from a mistake of law and appears reasonable. *See* 3 *Scott on Trusts* § 226, 1796–1802 (1967) and cases cited therein. *See Security Bank of New York v. Callahan,* 220 Mass. 84, 107 N.E. 385 (1915); *see also,* e.g., *State National Bank v. Payne,* 56 Ill.App. 147 (1894).

32. The pertinent terms of 12 O.S.Supp.1984 § 2022 are:

"A. Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability....

* * * * * *

C. * * * Where the party seeking relief by way of interpleader claims no interest in the subject of the action and the subject of the action has been deposited with the court ... the court should discharge him from the action and from liability as to the claims of the other parties to the action with costs and, in the discretion of the court, a reasonable attorney fee. * * *"

with favor, would have been appropriate here. *The seller, qua* obligee of the collateral agreement with the buyer which in equity amounts to a *pro tanto* assignment of policy proceeds, *clearly was the superior claimant.*

Whether the agent's status vis-a-vis the insurer was disclosed to the seller when the latter sought the payout is disputed. As pointed out earlier in this opinion and in the explanatory footnotes,[33] the decision on whether the seller is entitled to advance on appeal either of the two *ex contractu* theories of liability on the grounds that, at the critical time in question, the agent was acting for an undisclosed principal must be reached by the circuit court panel.

CERTIFIED QUESTION ANSWERED.

HODGES, V.C.J., and LAVENDER, DOOLIN, ALMA WILSON, KAUGER and SUMMERS, JJ., concur;

SIMMS and HARGRAVE, JJ., concur in part and dissent in part.

SIMMS, Justice, concurring in part, dissenting in part:

I concur in the portion of the majority opinion answering the question certified by the federal court.

I dissent, however, from the majority's decision to address unasked questions of contractual liabilities and remedies.

---

33.   *See* the text in footnotes 4, 20, and 24.