**RESOLUTION TRUST CORPORATION, as Receiver for Anchor Federal Savings and Loan Association, and Ray K. Babb, Jr., Trustee, Appellees,**

v.

**Allen E. GREER, Appellant.**

No. 78013.

Supreme Court of Oklahoma.

Nov. 7, 1995.

Rehearing Denied Feb. 12, 1996.

David B. Dykeman, W. Samuel Dykeman, Dykeman, Williamson & Williamson, Inc., Oklahoma City, for Appellant.

Cleve W. Powell, Northcutt, Clark, Gardner, Hron and Powell, Ponca City, for Appellees.

OPALA, Justice.

This certiorari tenders two questions: (1) May a corporation's *creditor*—Resolution Trust Corporation [RTC]—invoke the *doctrine of adverse domination* to toll the statute of limitations in an action against a director of Mega II Energy and Investment Corporation [corporation or Mega II] based on his *statutory* liability for the corporation's wrongful lending to another director? and (2) Is the *adverse domination doctrine* available in this wrongful-lending action—*not founded on fraud*—against a corporate director (who was *not* in the controlling group) to extend the limitation *beyond* the period during which the *corporation itself* could have brought a claim against the individual corporate director who was the wrongful borrower? Both of these questions meet today with our *negative* answer. Because we (a) conclude that the claims by RTC and Mega II's successor [1] are time barred and (b) view the *Greer-invoked* statute of limitations defense as *dispositive of the case before us,* the *other* tendered issues are not addressed.

## I

### THE ANATOMY OF LITIGATION

#### A

In 1982 Allen E. Greer [Greer or defendant] with Roy Lee Armstrong [Armstrong], W.J. Massey [Massey] and others purchased several oil and gas leases [the "Mueller leases"]. They financed the purchase with a $450,000 loan from People's National Bank.

Greer was part owner and director of this bank. In 1983 the Mueller leases were assigned to Mega II Energy and Investment Corporation [Mega II].

Mega II was incorporated in January 1983 by Armstrong, Massey, C. Fred Eberle and Greer. Although an original Mega II incorporator, Greer did not attend shareholder meetings nor did he *formally* accept his election either as a corporate director or officer. Neither did he participate in the company's day-to-day operations. So far as the record discloses, Greer's involvement with Mega II did not extend beyond assisting it in obtaining financing from People's National Bank.

In March 1983 Mega II borrowed $225,000 from People's National Bank—with Greer's help—to purchase the Kuehny oil and gas leases. Along with Armstrong and Massey, Greer signed the loan documents [2] and personally guaranteed this indebtedness.

Mega II was unable to repay the $450,000 and $225,000 notes when they came due in the latter part of 1983. Greer arranged to have these notes consolidated into a new $620,337.72 promissory note but was not a signatory to the new lending documents.

In early 1984 Mega II experienced severe financial difficulties and could not repay People's National Bank. On July 13, 1984 Mega II sold the Mueller leases for 1.5 million dollars. The sale proceeds were disbursed as follows:

a. July 13, 1984—$672,132.39 to People's National Bank to discharge Mega II's loans;

b. July 13, 1984—$300,000.00 to Armstrong and Massey;

c. July 13, 1984—$198,198.76 to various Mega II creditors;

d. From July 13, 1984 through October 31, 1984—$320,129.73 to the Mega Operating Account. [Of this amount $176,000.00 was used by Armstrong to finance a silver mine venture.]

---

1. Mega II brought a bankruptcy proceeding in the U.S. Bankruptcy Court for the Western District of Oklahoma on April 2, 1990; Ray K. Babb, Jr., its trustee, appears in this case as the corporate bankrupt's successor in interest.

2. The capacity in which Greer signed these documents is in contest. The suffix "V.P." appears after his name. He disputes that the abbreviated corporate title, placed next to his name, was on the loan document when he signed it.

Of the amounts shown in "b, c and d" Mega II has been reimbursed $35,479.80, which stands credited against Armstrong and Massey's $300,000 corporate loan.

### B

On September 19, 1984 Anchor Savings Association [Anchor] extended a loan to Standard Systems Program 03–1984 [Standard], which was secured by individual promissory notes from Standard's limited partners—one of whom was Mega II. On November 1, 1984 Anchor notified Mega II that all installments due under the terms of its promissory note to Standard should be paid to Anchor. On February 1, 1986 Mega II defaulted in the payment of this indebtedness.

On December 10, 1986 Anchor brought, in the Kay County District Court, separate actions against Armstrong, Massey and Mega II. On January 25, 1989 Anchor *amended its petition* against Armstrong *to include Greer as a party defendant* and to assert against him a claim for breach of the statutory and common-law fiduciary obligations due a corporation from its officers and directors. When Anchor was placed in receivership on August 30, 1989, *RTC succeeded* to its interest in this suit.

On April 4, 1990 notice went to the trial court that Armstrong, Massey and Mega II had filed for bankruptcy relief. By its August 13, 1990 order the U.S. Bankruptcy Court for the Western District of Oklahoma lifted the stay to allow RTC and *Ray K. Babb, Jr.* [Babb]—*the latter as Mega II's trustee in bankruptcy*—to press the fifth and sixth theories of liability[3] alleged in the action against Greer. The nisi prius order of November 20, 1990 allowed *Babb to intervene* in the Kay County District Court action.

After a *jury-waived trial*, judgment went against Greer on April 11, 1991. The Court of Appeals reversed. We granted certiorari to test the correctness of the Court of Appeals' legal analysis in reaching its conclusion that there was *no support in competent evidence* for attributing to Greer the status of an officer or director in Mega II.

## II

### THE STATUTE OF LIMITATIONS[4] THAT GOVERNS THE *RTC* AND *BABB* CAUSES OF ACTION AGAINST GREER ARE TO BE MEASURED BY THE UNDERLYING THEORIES OF LIABILITY

■ Oklahoma jurisprudence follows the *transactional approach* for its definition of a "cause of action".[5] The operative events that underlie a party's claim set the parameters for its cause of action. This conceptual approach ensures that litigants are able to invoke different theories of liability without

---

**3.** The fifth theory of recovery is based upon *statutory* officer-and-director *liability* established by 18 O.S.1981 § 1.175. For the pertinent terms of § 1.175, see *infra* note 8. The sixth theory is premised upon a breach of *common-law duty* owed to a corporation by its officers and directors.

**4.** In his May 5, 1989 answer to RTC's petition, Greer first interposed as an affirmative defense that RTC's claim under both theories of liability was time barred. He again assigned this point of law as a proposition for reversal and urged it in the briefs on appeal. *It stands unresolved by the Court of Appeals' opinion, whose thrust focused on whether Greer was in fact and in law an officer or director of Mega II.* The Court of Appeals concluded that Greer's status as a Mega II officer or director was unsupported by competent proof. On certiorari, *sua sponte* review of all issues undecided, though properly preserved and briefed on appeal, is due the party victorious in the Court of Appeals. *Hough v. Leonard*, Okl.,

867 P.2d 438, 446 (1993), amending Rule 3.15(A), Rules on Perfecting a Civil Appeal, 12 O.S.1991, Ch. 15, App. 3.

**5.** In *Retherford v. Halliburton Company*, Okl., 572 P.2d 966 (1978), we defined *cause of action* as follows:

"A cause of action ... exists to satisfy the needs of plaintiffs for a means of redress, of defendants for a conceptual context within which to defend an accusation, and of the courts for a framework within which to administer justice.

\* \* \* \* \* \*

"[T]his jurisdiction is committed to the wrongful act or transactional definition of a 'cause of action.' Thus, no matter how many 'rights' of a potential plaintiff are violated in the course of a single wrong or occurrence, damages flowing therefrom must be sought in one suit or stand barred by the prior adjudication." *Id.* at 968–69.

circumventing the law's applicable statute of limitations.[6] A plaintiff must rely on the operative events which occurred *within* the limitations that govern the theories of liability to be pressed at trial.[7]

■ The two theories of liability invoked by *RTC* and *Babb* rest upon the same operative facts—*Mega II's* extension of wrongful corporate loans to Armstrong and Massey. RTC and Babb urge that lending corporate funds to Armstrong and Massey [both Mega II directors] (1) *violates* the terms of 18 O.S.1981 § 1.175 [8] and (2) amounts to Greer's *breach of a common-law fiduciary duty* to Mega II as one of its officers and/or directors.[9] Ascertaining the period during which the claim against Greer could have been brought calls for determination of *when the cause of action arose* under *each* of the two advanced theories of liability.[10] The temporal point of a claim's accrual is depen-

dent upon (a) the nature of the right ·in litigation and (b) when the plaintiff could have *first* effectively maintained the action.[11]

## A
## THE NATURE OF RIGHTS ASSERTED BY *RTC* AND *BABB* AGAINST GREER

The *liability* sought to be imposed on Greer under the invoked terms of 18 O.S. 1981 § 1.175 [12] is *purely statutory*. The limitation that governs statutory liability is legislatively set at three years.[13] It is this period that governs *both* RTC and Babb's § 1.175 claims.

■ As for the *common-law duty* Greer is alleged to have breached, it lies either in contract imposed by law [14] or in trust created by operation of law.[15] The former is *promise-based*; the latter is rested on *a relational*

6. *Chandler v. Denton*, Okl., 741 P.2d 855, 863 (1987); *C & C Tile Co. v. Independent Sch. D. No. 7 of Tulsa Cty.*, Okl., 503 P.2d 554, 559 (1972).

7. *Doss Oil Royalty Co. v. Texas Co.*, 192 Okl. 359, 137 P.2d 934, 939 (1943).

8. The pertinent terms of 18 O.S.*1981* § 1.175 provide*d:*

"a. No domestic corporation ... shall lend any of its funds, assets, or credit to any officer or director of such corporation, ... directly or indirectly....
b. If any loan is made or security taken by such corporation, or subsidiary, in violation of the foregoing provisions, *all directors and officers* of the corporation making the same or assenting thereto, shall, *until repayment of such loan,* be jointly and severally liable to such corporation and its creditors for the debts of such corporation then existing or thereafter contracted; provided, that such liability shall be limited to the amount of such loan with interest." [Emphasis added.]
 * * * * * *
*The provisions of 18 O.S.1981 § 1.175—in force when the claims arose—were repealed by Laws 1986, c. 292, § 160 effective November 1, 1986.*

9. Oklahoma's extant jurisprudence recognizes a director's common-law fiduciary status and duty to the corporation. *Wilson v. Harlow*, Okl., 860 P.2d 793, 798 (1993); *Gay v. Akin*, Okl., 766 P.2d 985, 990–91 (1988); *Warren v. Century Bankcorporation, Inc.*, Okl., 741 P.2d 846, 849 (1987); *McKee v. Interstate Oil & Gas Co.*, 77 Okl. 260, 188 P. 109, 112 (1920).

10. *Chandler, supra* note 6 at 863.

11. *Samuel Roberts Noble Foundation, Inc. v. Vick*, Okl., 840 P.2d 619, 624 (1992); *MBA Commercial Const. v. Roy J. Hannaford*, Okl., 818 P.2d 469, 473 (1991); *Neff v. Willmott, Roberts & Looney*, 170 Okl. 460, 41 P.2d 86, 87 (1935).

12. For the pertinent terms of 18 O.S.*1981* § 1.175, see *supra* note 8.

13. Title 12 O.S.1991 § 95 provides in pertinent parts:

"Civil actions other than for the recovery of real property can only be brought within the following periods, *after the cause of action shall have accrued,* and not afterwards:
 * * * * * *
2. Within three (3) years: An action upon a *contract,* express or *implied not in writing; an action upon a liability created by statute* other than a forfeiture or penalty....
 * * * * * *
6. An action for relief, not hereinbefore provided for, can only be brought within five (5) years after the cause of action shall have accrued." [Emphasis added.]

14. For a general discussion of implied-in-law contracts, see *Shebester v. Triple Crown Insurers*, Okl., 826 P.2d 603, 610 (1992); *see also Hughes v. Reed*, 46 F.2d 435, 440 (10th Cir.1931).

15. For a general discussion of trusts created by operation of law, see *Matter of the Estate of Ingram*, Okl., 874 P.2d 1282, 1287 (1994); *McKee, supra* note 9 at 112. *See also Wilshire Oil Company of Texas v. Riffe*, 381 F.2d 646, 652 (10th Cir.1967); *Farmer v. Standeven*, 93 F.2d 959, 961 (10th Cir.1938).

*duty* [16] created by the ancient rules of chancery jurisprudence.

 Actions to enforce implied-in-law contracts are governed by a three-year limitation.[17] If *fraudulent conduct* is alleged in a breach-of-trust action, the applicable limitation is two years.[18] But if not, the exact limitation period that governs is not firmly settled by extant jurisprudence. We need not decide today the precise time when, in this case, the breach-of-trust remedy became extinguished.[19] This is so because, even if a common-law action for breach of trust by wrongful lending is governed by a five-year limitation, the *longest possible statutory time bar*,[20] the non-statutory claim pressed here against Greer was, when filed, clearly *dehors* the applicable limitation period.[21]

**B**

## THE TEMPORAL POINT AT WHICH THE CLAIMS UPON THE THEORIES ADVANCED IN THIS ACTION COULD FIRST HAVE BEEN EFFECTIVELY MAINTAINED

Mega II's 1984 lending transactions with its then-controlling directors represent the gravamen of RTC and Babb's claims against Greer. *The last of these corporate loans in suit was made no later than October 31, 1984.* Viewed in the context of the invoked theories of liability, it is this event that marks the beginning of the limitation period to be applied.

 The terms of § 1.175, which establish liability for proscribed corporate loans—enforceable by action of either the corporation or its creditors [22]—provided [23] that "all directors and officers of the corporation ... assenting thereto, shall, *until repayment of the loan*, be ... liable". If given *literal* meaning, the section's language might be taken as creating a *perpetual liability* that would extend *forever*—so long as the loan stood unrepaid. This result would clearly create an absurdity [24] not intended by the legislature. Enforcing the critical text's literal meaning would offend the legislature's explicit and long-standing commitment [25] to (a) fixed time limits for bringing litigation and (b) its time-honored disaffection for ap-

16. An implied-in-law contract is a synonym for quasi-contract or constructive contract. *Sandpiper North Apts., Ltd. v. American Nat'l. Bank*, Okl., 680 P.2d 983, 988 n. 10 (1984); *Davis v. National Bank of Tulsa*, Okl., 353 P.2d 482, 488 (1960). A quasi-contractual obligation is one imposed by the *legal fiction* of a promise implied in law. *Shebester, supra* note 14 at 610 n. 30. The obligation of a trustee by operation of law is drawn from the status of trustee/cestui que trust (beneficiary). *Rees v. Briscoe*, Okl., 315 P.2d 758, 762–63 (1957).

17. *T & S Investment Co. v. Coury*, Okl., 593 P.2d 503, 505 (1979).

18. *Jones v. Jones*, Okl., 459 P.2d 603, 604 (1969).

19. See *Jones, supra* note 18 at 605, where, as here, the court, on *finding it unnecessary to identify precisely* the governing limitation period, used these words:

 "We find it unnecessary to decide which of the two suggested limitations periods—the 2-year period prescribed by 12 O.S.1961 § 95(3) or the 5-year period prescribed by 12 O.S.1961 § 95(7)—is applicable since, in either case, the action is plainly barred."

20. For the statutory litany of general limitation periods, see the terms of 12 O.S.1991 § 95, *supra* note 13.

21. Babb's claim against Greer—*qua* Mega II's trustee in bankruptcy—was first brought *not earlier* than November 6, 1990, more than five years after it arose, on October 31, 1984, under *either* the statutory or common-law theory of liability.

22. The record discloses that Anchor became a creditor of Mega II on November 1, 1984. For the definition of a creditor, see the terms of 24 O.S.1991 § 2, *infra* note 29.

23. The terms of 18 O.S.*1981* § 1.175, the statute in question here, were *repealed* effective November 1, 1986. *See supra* note 8.

24. If this can be done without violating legislative intent, courts must avoid statutory construction that would lead to an absurdity. *Jackson v. Mercy Health Center, Inc.*, Okl., 864 P.2d 839, 844 (1993); *TXO Production v. Oklahoma Corp. Com'n*, Okl., 829 P.2d 964, 969 (1992); *City of Norman v. Liddell*, Okl., 596 P.2d 879, 882 (1979).

25. The legislature's general policy—that for *every* cause of action, whether legal or equitable, there shall be a *fixed limitation*—is clearly manifested

plying to civil actions the common-law notion of *immemorial prescription.*[26] The legislature's obvious goal—that of making an assenting director's § 1.175 liability for unauthorized corporate lending *co-extensive* with that of the wrongful borrower who stands principally accountable for repayment of the corporate funds expended *sans* legal authority—is clearly divinable from the phrase that sets the outer limit of the director's vicarious liability—"until repayment of such [unauthorized] loan."[27] This key phrase is best harmonized with the *expressed* general legislative policy against eternally enforceable obligations when the following words are added to the critical text of the section: "or until the obligation becomes irremediable by lapse of time." Once the lawmaking body's intent in enacting a statute is ascertained, *its language may be altered or new words supplied* to effectuate the legislative will.[28]

Mindful of this principle, we hold that in the § 1.175 sense "until repaid" means "for so long as the loan remains actionable" in a suit by the obligor.

■ We next pass to determine when the claim could *first* have been effectively maintained against Armstrong and Massey for repayment of the wrongfully lent corporate funds. The notation on Mega II's books of an account receivable from Armstrong and Massey (in the amount of $300,000) implies a promise of repayment and evidences a debtor/creditor relationship[29] between (a) Armstrong and Massey on one side and (b) Mega II on the other. The legal claim against Armstrong and Massey to secure repayment of Mega II's corporate funds *is for debt*[30] *payable on demand.* Extant jurisprudence holds that a loan of money payable on demand creates a *presently effective debt* and an action for its repayment can be main-

---

in the preface and in the residuary provisions of 12 O.S.1991 § 95(9). These are:

"*Civil actions ... can only* be brought within the following periods....

\* \* \* \* \* \*

An action for relief, not hereinbefore provided for, can only be brought with five (5) years after the cause of action shall have accrued." [Emphasis added.]

*See also Bechler v. Kaye,* 222 F.2d 216, 220 (10th Cir.1955), *cert. denied,* 350 U.S. 837, 76 S.Ct. 75, 100 L.Ed. 747 (1955).

26. Because *the notion of a fixed time* for bringing an action was unknown to the common law, the power to limit the time must be regarded as exclusively legislative. *Lake v. Lietch,* Okl., 550 P.2d 935, 937 (1976). The only limitation of time developed by the common law *sans statutory aid* was its so-called "*immemorial prescription.*" It was not until the 17th century that Parliament began passing legislation prescribing fixed time limits within which an action must be brought or the remedy extinguished. *See* Opala, *Praescriptio Temporis and its Relation to Prescriptive Easements in the Anglo–American Law,* 7 TULSA L.J. 107, 111–113, 124 [1971].

27. For the pertinent terms of 18 O.S.1981 § 1.175, see *supra* note 8.

28. *WRG Const. Co. v. Hoebel,* Okl., 600 P.2d 334, 337 (1979); *Protest of Chicago R.I. & P. Ry. Co.,* 137 Okl. 186, 279 P. 319 (1929).

29. *See* 25 O.S.1991 § 8, which provides in pertinent part:

"... every one who *owes* to another the *performance of an obligation* is called a *debtor,* and one to whom he owes it is called a *creditor.*" [Emphasis added.]

*See also McFarling v. Demco, Inc.,* Okl., 546 P.2d 625, 628 (1976).

The debtor/creditor status is further defined in 24 O.S.1991 § 1, whose terms define a *debtor* as:

"... one who, by reason of an existing obligation, is, or may become, liable to pay money to another, whether such liability is certain or contingent."

and in 24 O.S.1991 § 2, whose terms define *creditor* as:

"... one in whose favor an obligation exists, by reason of which he is, or may become, entitled to the payment of money."

30. The common-law form of action known as *debt* was for failing to pay money due to another. It was thought of as one for a *breach of duty* rather than a breach of *contract. Young v. Queensland Trustees Ltd.* (1956) 99 CLR 560. *See* Baker, AN INTRODUCTION TO ENGLISH LEGAL HISTORY, p. 267 (1979), which relates:

"The writ of debt ... was not at all concerned with the enforcement of promises or agreements;.... It lay to enforce the *obligation or duty* of payment...." [Emphasis added.]

*See also* Cooke and Oughton, THE COMMON LAW OF OBLIGATIONS, pp. 7–9 (Butterworths 1993).

tained *at any time after the date of the loan.*[31]

█ Because Greer's statutory exposure to repayment of the debt is co-extensive with, but not longer than, that of Armstrong and Massey, the § 1.175 [32] cause of action in favor of *Babb* [as legal successor of Mega II] [33] and in favor of *RTC* [34] accrued on October 31, 1984—the date of the last wrongfully made corporate loan. The corporation's cause of action to enforce Greer's *common-law* liability *qua* director accrued *at the same time as the statutory § 1.175 claim.*

## III

### RTC'S § 1.175 CLAIM WAS TIME BARRED WHEN ITS ACTION WAS BROUGHT; THIS IS SO BECAUSE UNDER OKLAHOMA JURISPRUDENCE THE USE OF THE ADVERSE DOMINATION DOCTRINE IS AVAILABLE *ONLY* TO THE CORPORATION AND *NOT* TO ITS CREDITORS

█ Anchor first prosecuted its demand against Greer by an amended petition filed on January 25, 1989, *more than three years after* its § 1.175 claim arose. Absent some recognized equitable vehicle for tolling the applicable three-year limitation that governs the statutory liability in suit here,[35] Anchor's claim against Greer became time barred *af-* ter October 31, 1987. As successor to Anchor—a Mega II creditor—RTC *impermissibly invoked* the adverse domination doctrine to toll the applicable limitation.[36] Although we recognized in *RTC v. Grant* [37] that the equitable doctrine of adverse domination may extend limitations that govern a *corporation's* cause of action against nefarious directors and officers in control, the doctrine is available *only to the corporation.*[38] *Creditors may not claim its tolling benefits.* RTC occupies here the same status as any other Mega II creditor. It may not avoid the § 95(2) [39] time bar of three years by invoking the adverse domination doctrine.

## IV

### THE COMMON–LAW CLAIM FOR A DIRECTOR'S BREACH OF FIDUCIARY DUTY TO A CORPORATION BELONGS *SOLELY TO THE CORPORATE ENTITY; A CREDITOR* CANNOT MAINTAIN AN ACTION FOR CORPORATE MISMANAGEMENT AGAINST A CORPORATION'S DIRECTOR

█ Both RTC and Babb claim Greer breached his common-law fiduciary duty to Mega II. Assuming that Greer held corporate offices in Mega II [an issue we need not re-explore here], redress for any breach of a non-statutory duty attendant upon his fidu-

---

31. *Morgan v. Russell,* 189 Okl. 653, 119 P.2d 87, 88 (1941).

32. For the pertinent terms of 18 O.S.*1981* § 1.175, see *supra* note 8.

33. In the event of a corporate bankruptcy, fiduciary obligations—normally actionable directly by the corporation—become enforceable by the trustee. *Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). *See also Koch Refining v. Farmers Union Cent. Exchange, Inc.,* 831 F.2d 1339, 1343 (7th Cir.1987); *Delgado Oil Co. v. Torres,* 785 F.2d 857, 860 (10th Cir.1986).

34. As a creditor, RTC has the *same right* to enforce Greer's § 1.175 liability and *the same length of time* as Mega II—the corporate obligee entitled to repayment of the unauthorized loans.

35. For the terms of the applicable statute of limitations, see *supra* note 13.

36. The doctrine of adverse domination—advanced here by RTC—appears to be rested solely on notions of the *federal common law.* Open-ended use of federal common law to preempt the applicable state remedial regime is no longer favored by the U.S. Supreme Court. Only where it is required by some explicit federal statutory provision or where recognition of a federal rule of decision is critical because of a significant conflict between a genuinely identifiable federal policy or interest and the applicable state law, may the latter be deemed supplanted by the body of controlling federal norms. *O'Melveny & Myers v. F.D.I.C.,* ── U.S. ──, ──, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994).

37. *RTC v. Grant,* Okl., 901 P.2d 807 (1995). While Oklahoma's doctrine of adverse domination may to some degree parallel that crafted by the circuit jurisprudence, its source of authority and contours are drawn *solely* from this state's norms of Oklahoma's declared common law.

38. *Grant, supra* note 37 at 811.

39. For the pertinent terms of 12 O.S.1991 § 95(2), see *supra* note 13.

ciary status would belong to the corporatio:. alone, *not to its creditors.*[40] As a Mega II creditor, RTC cannot press a claim for Greer's breach of a common-law duty due *exclusively* to Mega II.

## V

## THE LIMITATIONS WHICH GOVERN THE THEORIES OF LIABILITY ADVANCED BY BABB (*QUA* TRUSTEE IN BANKRUPTCY) ON THE CORPORATION'S BEHALF CANNOT BE EXTENDED BY THE ADVERSE DOMINATION DOCTRINE; THIS IS SO BECAUSE THE CLAIMS AGAINST GREER ARE BASED *NOT ON FRAUD* BUT ON NEGLIGENCE

In *Grant*[41] the court limited the adverse domination doctrine's outer sweep to causes of action predicated upon *fraud.*[42] *Fraud was not pled* as a basis for Greer's liability.[43] Neither is there any record support for the notion that Greer's conduct amounted in law to anything other than mere *negligence.*

In attempting to establish Greer's § 1.175[44] liability, Babb relied upon the improper corporate loans made to Mega II directors—not upon evidence of fraudulent conduct by Greer. *Sans* fraud, Oklahoma's version of the adverse domination doctrine cannot avail in a § *1.175 claim.*

Assuming, without deciding, that the longest possible statutory limitation period of five years[45] governs the *non-statutory claim* for Greer's breach of his fiduciary duty, Mega II would have had *until October 31, 1989* to commence its action against Greer for enforcement of his common-law liability. On behalf of Mega II, Babb first brought the corporate claim against Greer not earlier than November 6, 1990—more than five

years *after* the cause had accrued on October 31, 1984.[46] Absent any viable tolling, the corporation's common-law claim was time barred when its action was brought.

Oklahoma's version of the adverse domination doctrine will *not* extend the law's limitation for the statutory or common-law bases of Babb's claim against Greer. In short, *Babb's* claim came too late. It was time barred when brought.

## VI

## SUMMARY

Under the transactional approach that defines a cause of action, Mega II's act of wrongfully lending corporate funds to its controlling directors sets the parameters for *RTC* and *Babb's* demands against Greer. *Since the last unauthorized (offending) loan* was made no later than October 31, 1984, it is that date which *marks the accrual* of Babb's claim against Greer under either of the two advanced theories of liability. Because *Babb's* claim for the bankrupt corporation (Mega II) was brought more than five years after its accrual, it stood time barred when brought. On this record, the adverse domination doctrine's Oklahoma version cannot be invoked to extend the limitation for either (a) Greer's *common-law* liability for breach of a fiduciary duty or (b) his *statutory* responsibility for wrongful corporate lending to a director. It is *undisputed* that RTC, as Anchor's successor, stands in the shoes of a Mega II creditor. A corporation's own *common-law* claim against a third party may not be pressed by its creditors. *Mega II's* non-statutory claim against Greer is hence unavailable to RTC. *RTC's creditor* status also prevents it from invoking the benefit of the adverse domination theory to extend the limitation that governs its § 1.175 claim. It is for this reason that *RTC's statutory* claim

**40.** *Cooke v. Tankersley,* 199 Okl. 634, 189 P.2d 417, 419 (1948).

**41.** *See Grant, supra* note 37.

**42.** *Grant, supra* note 37 at 815–16.

**43.** The circumstances surrounding fraud must be pled with sufficient particularity to afford an opponent adequate notice to prepare a responsive pleading. *Gianfillippo v. Northland Cas.*

*Co.,* Okl., 861 P.2d 308, 310–11 (1993); *Akin, supra* note 9 at 990, 993.

**44.** For the pertinent terms of 18 O.S.*1981* § 1.175, see *supra* note 8.

**45.** *See* the terms of 12 O.S.1991 § 95(6), *supra* note 13.

**46.** Mega II filed for bankruptcy protection on April 2, 1990—more than five years *after* the claims against Greer had accrued.

against Greer became time barred on November 1, 1987—more than a year *before* it was brought on January 25, 1989. On certiorari previously granted,

**THE COURT OF APPEALS' OPINION IS VACATED; THE NISI PRIUS JUDGMENT IS REVERSED; AND THE CAUSE IS REMANDED WITH DIRECTION TO ENTER JUDGMENT FOR GREER DENYING RECOVERY ON THE TIME–BARRED CLAIMS.**

HODGES, LAVENDER, SIMMS, HARGRAVE, SUMMERS, and WATT, JJ., concur.

KAUGER, V.C.J., concurs in part and dissents in part.

ALMA WILSON, C.J., dissents.